EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* RAFAEL ANDRADES GONZÁLEZ, acusado y apelante.

*Número:* 17000. *Resuelto:* 17 de noviembre de 1961.

*Ángel Viera Martínez,* abogado del apelante; *J. B. Fernández Badillo, Procurador General de Puerto Rico* y *Rodolfo Cruz Contreras, Procurador General Auxiliar,* abogados del apelado.

Sala integrada por el Juez Presidente señor Negrón Fernández, como Presidente de Sala, y los Jueces Asociados señores Blanco Lugo y Dávila.

PER CURIAM: Es un caso de hurto. El acusado admite los hechos pero alega que estaba en estado de embriaguez y eso lo releva de responsabilidad. Para la fecha de los hechos el perjudicado, era un hombre soltero que vivía sólo en un apartamiento en Río Piedras. Describe así lo acontecido. El 16 de noviembre de 1957 como a las siete de la noche salió a visitar a su madre. Regresó cerca de las diez y se detuvo a hablar con unos amigos en una farmacia frente al edificio donde reside. De allí pasó a un bar cercano. Sería la una de la madrugada del diecisiete. Allí estuvo buen rato y se acercó una persona de nombre Juan Antonio Rodríguez Velázquez, quien es conocido por Chiquitín. Hablaron de actividades hípicas, ya que este último trabajaba en una cuadra del hipódromo. Estuvo allí hasta las cinco de la mañana. A esa hora, en compañía de "Chiquitín" visitó un cafetín en la antigua Plaza del Mercado de Río Piedras. Al rato de estar allí, se le acercó el acusado, Rafael Andrades González, a quien invitaron a tomar una cerveza. Este se sentó y hablaron de temas hípicos. Andrades le informó que tenía un tío que era jinete. Al poco rato surgió en la conversación el tema de la música y el acusado Andrades manifestó que a él le gustaba la música. El perjudicado entonces, invitó a "Chiquitín" y al acusado a ir a su apartamiento. Ya eran las seis y media de la mañana. El perjudicado llevó una docena de cervezas frías para seguir tomando. Oyeron música. Luego de tomar un par de cervezas, "Chiquitín" se quedó dormido, como a las siete y media. El perjudicado y el acusado siguieron bebiendo. En algún momento el perjudicado lleva al acusado a su cuarto para enseñarle unas camisas "sport", con el propósito de regalárselas, si le servían. El acusado las aceptó y las pusieron sobre una tabla de planchar. A las nueve, despertaron a "Chiquitín", quien marchó a su trabajo. Como a las diez de la mañana, luego de beberse todas las cervezas, el perjudicado se tiró vestido sobre su cama y se quedó dormido. No despierta hasta por la tarde.

Ya el acusado no estaba. Por la tarde sale. Al otro día cuando se levanta por la mañana nota que le falta una pistola. Luego se da cuenta que también le falta un reloj y un encendedor.

El perjudicado informó lo sucedido a la policía. Se investigó el asunto y el detective a cargo conocía a un hermano del acusado y le informó lo que investigaba. El hermano entonces llevó al acusado al cuartel. Allí, el acusado admitió que tenía la pistola, pero que la había entregado a un amigo para que la guardara. Fueron a casa del amigo. En el camino hizo entrega del reloj al detective. Ocuparon la pistola. Unos días después el acusado fue a entregar el encendedor. Cuando llamaron al perjudicado al cuartel para que identificara los objetos, no conoció al acusado. Tuvieron que informarle que esa era la persona con quien había estado el día de los hechos.

Se presentaron acusaciones por hurto mayor, portación de armas y poseer un arma sin permiso. Durante el juicio se desistió de seguir el caso como hurto mayor y se siguió como de menor cuantía. El juicio de hurto y portar armas se celebró ante el jurado, el otro por tribunal de derecho.

Para sostener la acusación declaró el perjudicado. Su declaración sostiene en lo pertinente a su conocimiento los hechos antes expuestos. De su declaración surge que el acusado con él, se tomó a lo sumo siete cervezas desde las cinco hasta la diez de la mañana. Los otros fueron sostenidos por la declaración del detective que investigó y por la persona a quien el acusado entregó la pistola para que la guardara. Este testigo manifestó que el acusado le había informado que la guardara en lo que encontraba al dueño, pues no sabía de quién era ya que no se recordaba cómo había venido a su posesión.

La prueba de la defensa consistió en el testimonio de un amigo del acusado que lo recogió de una acera el domingo por la mañana y lo llevó a su casa en Carolina; el testimonio

de un hermano que describe el estado de inconsciencia en que se encontraba el acusado ese domingo cuando llegó a la casa, debido a la embriaguez y el testimonio de un químico, que declara sobre el número de tragos que tiene que ingerir una persona para encontrarse inconsciente, como describieron que estaba el acusado los testigos de defensa. A una pregunta del fiscal de si una persona que toma siete cervezas de cinco a diez de la mañana se intoxica en tal forma que se vuelva inconsciente, contestó negativamente.

Diecisiete razones aduce el apelante para que se revoque la sentencia que lo condenó a sufrir un año de cárcel, en el caso de hurto menor, de uno a dos años de presidio en el de portar armas y a seis meses de cárcel en el de posesión de un arma sin autorización para ello. Esta última pena concurrente con la del caso de hurto.

Los tres primeros errores los discute conjuntamente. Al exponer su teoría del caso en los comienzos del proceso el fiscal manifestó "que tanto este acusado como los parientes de él fueron a la casa del perjudicado con posterioridad a la fecha de los hechos y estando él allí, unos familiares del acusado le informaron al perjudicado que "Bendito, la viejita está mala. . ." que además de decirle que tenía la mamá enferma, le dijeron que "este joven [refiriéndose al acusado] estaba arrepentido, que esa era una cuestión de que estaba borracho, pero que él posteriormente se había arrepentido de eso. . .".

Sostiene el apelante que se cometió error al permitir que el fiscal hiciera las manifestaciones transcritas, y al permitir que al declarar el perjudicado repitiera esas manifestaciones en presencia del jurado, así como el permitir que el fiscal recalcara la petición de clemencia que se atribuye a los familiares del acusado y que erró también al permitir que el fiscal dijera que el acusado debió protestar de su inocencia cuando sus parientes hicieron las manifestaciones antes transcritas, y al no dar instrucciones rigurosas al jurado en el sentido de

que no debía tenerlas en cuenta. Afirma que la manifestación del fiscal al efecto de que el acusado debió protestar cuando sus parientes hablaron con el perjudicado equivale a comentar su silencio.

Suponiendo que la ocurrencia de lo relatado en la forma que apunta el apelante constituyera error, lo cierto es que el juez ordenó la eliminación de las manifestaciones del perjudicado que se impugnan. A la pág. 52 de la T. de E. se expresa:

"...Se ordena la eliminación y se instruye a las damas y caballeros del jurado, en consonancia con la solicitud de la defensa, que no deben ustedes tomar para nada en consideración las manifestaciones del testigo en relación con la conversación habida entre los hermanos del acusado y él en la fecha a que él hace referencia."

Y a la página 53 se manifiesta así:

"Habiéndose resuelto que no deben ustedes tomar en consideración para nada las manifestaciones o la declaración del testigo en relación con esa conversación entre los hermanos en presencia del acusado y él, el tribunal instruye que no hay prueba para las manifestaciones del fiscal en el sentido de que el acusado venía obligado a negar, a hablar, a rechazar imputación alguna de alguna actuación. De modo que deben ustedes también rechazar cualquier inferencia que pueda haber ocurrido por motivo de las manifestaciones del fiscal."

▮ Vale no obstante apuntar que el hecho de que el fiscal no pudiera establecer lo que anunció en su informe no constituye error en ausencia de mala fe. *Pueblo* v. *Rivera Romero*, 83 D.P.R. 471 (1961). Y que el comentario del fiscal sobre la actitud del acusado al no protestar cuando sus familiares hablaron con el perjudicado no equivale a comentar su silencio. *Pueblo* v. *Millán*, 35 D.P.R. 889 (1926).

▮ Pasemos a considerar el error que apunta el apelante consistente en que al testigo de cargo Roldán no se le permitió, a preguntas de la defensa, que relatara todo lo que le había manifestado el acusado cuando le entregó la pistola.

Roldán declaró que cuando el acusado le llevó la pistola para que la guardara le había manifestado que estaba buscando al dueño del arma, para entregarle la pistola. Entonces la defensa trató de interrogarle en cuanto a otras manifestaciones del acusado en esa ocasión, específicamente en cuanto a si le había dicho en qué estado se encontraba por haber ingerido mucho licor. El juez no lo permitió por considerar las manifestaciones como en beneficio propio ("self-serving"). Entendemos que esas manifestaciones lo eran, pero aún así la realidad es que la actuación del juez no perjudicó al acusado ya que él presentó prueba independiente al efecto de que al salir de la casa del perjudicado estaba tan inconsciente, que fue recogido de una acera por un amigo.

El próximo error consiste en haber admitido la declaración del detective a quien el acusado le admitió haberse llevado los efectos de la casa del perjudicado, a pesar de que el acusado prestó una declaración escrita que luego el fiscal presentó en evidencia. *Pueblo* v. *Saltari*, 53 D.P.R. 893 (1938) resuelve esta cuestión en contra del apelante.

Pasemos a considerar otro de los errores apuntados. Cuando el fiscal presentó al detective a que se alude en el párrafo anterior, para probar que el acusado admitió los hechos que se le imputan y cuando fue a presentar la declaración jurada a que también aludimos, el juez ordenó que el jurado se retirara para hacer la determinación previa de voluntariedad que exigen *Pueblo* v. *Declet*, 65 D.P.R. 23 (1945) y *Pueblo* v. *Fournier*, 77 D.P.R. 222 (1954). Al regresar el jurado el juez lo instruyó según lo requiere la jurisprudencia, pero le expresó que "[e]l Tribunal, como una cuestión previa de derecho, entiende que existen elementos de voluntariedad para ser admitida su declaración". También les dice: "Señoras y caballeros del jurado, el fiscal intenta ahora en este momento, intentará establecer ciertos hechos en relación con los que el tribunal ha hecho una determinación previa de que existen elementos de voluntariedad

suficientes para que esos hechos que van a ser sometidos al jurado, sean, como cuestión de hecho, sometidos a la consideración de ustedes," y en otra parte "Recordarán las damas y caballeros del jurado en algún momento durante el transcurso de este proceso os dije que el tribunal había hecho una determinación de voluntariedad en relación con la supuesta confesión o admisión del acusado... Y en otra ocasión: "Recordarán, señoras y señores del jurado, que dije entonces que aquella previa determinación no tenía otro alcance que justificar la actuación del tribunal o justificar al tribunal para someter a la consideración de ustedes esas piezas de evidencia."

El apelante sostiene que esas instrucciones son contrarias a lo expuesto en *Declet* y *Fournier*, pues el juez manifestó que entiende que fueron voluntarias las manifestaciones del acusado ante el detective y lo que expuso en la declaración jurada, y que por lo tanto tuvo que influir en la determinación que hiciera el jurado sobre este extremo.

En primer lugar en *Declet* y *Fournier*, se dice que la mejor práctica es retirar al jurado para hacer la primera determinación en cuanto a la voluntariedad, que es función del juez que preside. Pero no es imprescindible que se haga. Ahora, repetimos aquí que siempre se debe retirar al jurado. Pero puede hacerse la determinación inicial en presencia del jurado aunque, repetimos no es la mejor práctica y entonces someterla para que este haga la determinación final, claro está que el juez ha tenido que hacer una determinación previa de que había prueba tendente a demostrar que fue voluntaria la declaración. Si así no fuera, la confesión no iría al jurado. Como cuestión de realidad en todos los casos en que va al jurado la segunda etapa, es porque el juez ha hecho una determinación previa al efecto de que hay prueba que tiende a establecer que la admisión o confesión fue voluntaria. Para evitar confusión, el jurado debe siempre retirarse en la primera etapa y no hay necesidad de informarle cuando se le

instruya que el juez ha hecho una determinación previa de que hay prueba al efecto de que la confesión es voluntaria.

Ahora, la realidad es que el juez instruyó al jurado como sigue:

"...Recordarán, señoras y señores del jurado, que dije entonces que aquella previa determinación no tenía otro alcance que justificar la actuación del tribunal o justificar al tribunal para someter a la consideración de ustedes esas piezas de evidencia, pero ustedes serían, las damas y caballeros del jurado, los que finalmente habrían de determinar como resultado toda la prueba aquí practicada, si esas declaraciones del acusado, tanto la escrita como la verbal en Carolina, según se ha dicho aquí en la prueba, si fueron prestadas por él libre, espontánea y voluntariamente y sin que en forma alguna, señoras y señores del jurado, pueda pesar sobre la conciencia de ustedes para nada el hecho de que el tribunal hizo una previa determinación de elementos de voluntariedad para que pudiese ir esa prueba a la consideración de ustedes. Os dije entonces, y os repito ahora, que esa previa determinación en nada compromete ni obliga a las damas y caballeros del jurado en la decisión de si estas declaraciones que ha tendido a establecer la prueba, prestó u ofreció este acusado fueron por él prestadas voluntariamente o no. Voluntariamente, señores, lo dice también el vocablo. Espontáneamente lo explica también el propio vocablo. Que fueron hechas de la propia espontaneidad sin que haya mediado amenaza alguna que pudiese torturar la voluntad del acusado y llevarlo bien en contra de su propia voluntad a declarar, violencia física, coacción sicológica, corrección de clase alguna, en otras palabras, señores, la ausencia total de algún factor que pudiese, muy a pesar de que fuese su deseo, llevar a este señor a prestar, a hacer esa manifestación, repito, así en Carolina como, repito, así en la oficina del fiscal en San Juan. Voluntariamente también, señoras y señores del jurado, repele la posibilidad de que las dos o cualquiera de ellas de esas declaraciones, hayan sido prestadas por el acusado obedeciendo a una promesa de beneficio, de lenuencia, de protección; promesas, señoras y señores del jurado que pudieran haber llevado a este señor a decirle en el hondo de su conciencia: 'Es mejor que yo diga estas cosas, aunque yo no quiera decirlas, porque con promesas que me han hecho voy a salir beneficiado si hago divulgación de estos

hechos'. De manera que son ustedes y nadie más que ustedes los llamados a determinar, señoras y señores del jurado, si esas declaraciones del acusado, las dos, tanto la que se produjo verbalmente en Carolina, como la que se produjo en la fiscalía ante el señor Agraít Oliveras, según ha tendido a establecer aquí la prueba, son la consecuencia de una voluntad definida en ese sentido, sin que haya habido elemento de presión, de amenaza, de coacción, de coerción o de promesa que pudiese haber movido a este señor, el acusado, a hacer las mismas; o si, por el contrario, esas manifestaciones, si entienden ustedes que él las hizo, fueron el producto de su voluntad libre. Quiero decirles que sigue siendo y lo ha sido a lo largo de este proceso y lo seguirá siendo ante la conciencia de ustedes, responsabilidad del señor fiscal de dejar a ustedes convencidos, la obligación se la impone la ley a él, de dejarlos a ustedes convencidos de que esas declaraciones fueron prestadas voluntariamente antes de que puedan ustedes aceptar como elemento de prueba en su contra esas declaraciones, señoras y señores del jurado."

Así, el juez le hizo claro al jurado que eran ellos los que tenían que hacer la determinación final sobre la voluntariedad. Conviene apuntar que no hubo prueba por parte del acusado para demostrar que no fue voluntaria su admisión ante el detective, ni su confesión ante el fiscal.

En el caso de *Pueblo* v. *Medina*, 72 D.P.R. 254 (1951) citado por el apelante, el juez manifestó que "la corte resolvía que la declaración fue voluntaria y que el jurado la examinaría cuando llegara su oportunidad". Y luego no se presentó prueba sobre la voluntariedad ante el jurado tal como lo requiere *Declet*. Es obvio el error, así como la inaplicabilidad del caso a los hechos de éste.

■ Discutiremos el error décimosexto por estar relacionado con el que acabamos de considerar. Se queja el apelante de que la corte instruyó al jurado al efecto de que "[s]i, por el contrario ustedes entendieran que ellas no fueron prestadas voluntariamente, entonces ustedes quedan en libertad de rechazarlas totalmente y de no utilizarlas como prueba contra este acusado."

Y el apelante sostiene que no es que el jurado esté en libertad de rechazar la confesión sino que está en la obligación de hacerlo. Obviamente el juez debió ser más específico en todas las ocasiones en que trató esta cuestión en sus instrucciones. El deber del jurado es rechazar la confesión si llega a la conclusión que no es voluntaria y así se lo hizo saber el juez cuando lo instruyó en el sentido de que el fiscal estaba en la obligación de "dejarlos a ustedes convencidos de que esas declaraciones fueron prestadas voluntariamente *antes de que puedan ustedes aceptar como elemento de prueba en su contra esas declaraciones*, señoras y señores del jurado". (Énfasis suplido.)

■ Así tomadas en conjunto cumplen con lo que la ley requiere. Ahora, siempre debe tenerse especial cuidado en que todas las instrucciones que se transmitan al jurado sean claras, precisas y sencillas. Es como mejor se entienden.

Lo próximo que apunta el apelante es que fue erróneo no admitir lo que a sus familiares manifestó el acusado cuando se encontró con que tenía en su posesión la pistola. Lo que se proponía establecer con esta evidencia ya estaba establecido y con la prueba del fiscal. Recuérdese que el testigo de cargo Roldán manifestó que el acusado al entregarle la pistola le dijo que no recordaba de quien era y que estaba buscando a su dueño para entregarla. Consistente con su teoría de que estaba tan ebrio que no se daba cuenta de lo que hacía. El jurado, pues tuvo ante su consideración esa prueba y de parte de un testigo del fiscal.

■ Cuando declaraba el hermano del acusado y se refirió al estado de embriaguez del acusado, el fiscal le preguntó si había otras sustancias que producen el mismo efecto, aparte del alcohol. El apelante objetó estas preguntas y el juez lo sostuvo. Alega que la pregunta insinuaba que el acusado usaba drogas y que eso le perjudicaba ante el jurado. Pero es que el juez sostuvo inmediatamente la objeción. Recientemente dijimos en *Pueblo* v. *Rivera Romero,* 83 D.P.R. 471

(1961) que no podíamos presumir que el jurado sea tan susceptible, que cualquier cosa lo pueda afectar en tal forma que no pueda rendir un veredicto justo e imparcial. Aquí lo repetimos.

El noveno se refiere a que el tribunal manifestó que entendía que un químico no podía determinar la cantidad de alcohol a ingerirse por una persona para que le produjera la inconsciencia. El químico luego de la solicitud de reconsideración del apelante declaró sobre este extremo, pero el acusado sostiene que esa primera manifestación del juez lo perjudicó. Obviamente no es así.

El décimo se refiere a que el apelante entiende que el tribunal sentenciador cometió error al enfatizar y decir "déjeme coger eso" y continuar preguntando al químico en el turno de la repregunta del fiscal, cuando el químico declaraba sobre el efecto que causaría en una persona ingerir siete cervezas en cuatro horas. La expresión del juez es un comentario en alta voz que hace antes de anotar lo que el químico está declarando. Luego de esa expresión le hace algunas preguntas aclaratorias al testigo. El acusado alega que el comentario y las preguntas que siguieron afectó adversamente al acusado. No tiene razón el apelante. La intervención del juez fue la usual y claramente no perjudicó al acusado. *Pueblo* v. *Cordero*, 82 D.P.R. 379 (1961).

Las instrucciones que impugna el apelante mediante su undécimo señalamiento se refieren a la consideración que debe darle el jurado a la posesión de objetos hurtados. (¹) Cumplen con la ley.

---

(¹) "Raras veces tiene el jurado que determinar el efecto de la evidencia de la simple posesión reciente de los objetos hurtados. Por la propia naturaleza del caso, el hecho de la posesión está acompañado generalmente de otras circunstancias corroborantes o que explican la de la presunción. Si la parte ha escondido la propiedad, si negare que estuviere en posesión de la misma y luego se descubre la falsedad de su negativa; si no pudiere revelar el modo y forma que llegó a posesionarse de la misma; si diere explicaciones falsas, increíbles o incongruentes del modo y forma en que adquirió la misma, como, por ejemplo, que la encontró o que se la vendió o que se la dio o vendió un extraño o que la dejó en su casa; si hubiere

 El apelante se queja de que el juez al instruir al jurado sobre la materia exculpatoria manifestó que materia exculpatoria, "el vocablo mismo sugiere lo que quiere decir 'exculpatoria' materia en que el acusado quiere, el declarante quiere alejarse de la culpa, alejarse de toda responsabilidad." Alega que con esta instrucción el jurado tendría que hacer la inferencia de que no puede dársele crédito a la materia exculpatoria. Nada hay que justifique hacer esta inferencia. En *Pueblo* v. *Millán*, 66 D.P.R. 243 (1946) dijimos:

"Su declaración no es otra cosa que lo que se conoce como un *exculpatory* statement, mediante el cual una persona trata de protegerse declarando que no tuvo participación alguna en el hecho delictivo que se investiga."

Y el juez además expresó:

"Si a juicio del jurado, por las circunstancias que rodean, entienden que merecen crédito, [la materia exculpatoria] y deben dárselo y creerlas, bien. Pero si por esas mismas circunstancias entienden que no deben darle crédito a esas manifestaciones en que el acusado trata alejarse de la culpa, están en su perfectísimo derecho de desechar las mismas y no darles crédito alguno."

 Sostiene el apelante que las instrucciones sobre embriaguez con relación al caso de hurto son erróneas. No lo son. Siguen lo preceptuado por este Tribunal en *Pueblo* v.

---

dispuesto o tratado de disponer de la misma a un precio bajo fuera de razón, y si se hubiere ocultado o tratado de escapar de la acción de la justicia; si se encontraren en su poder otros objetos robados, o herramientas propias para verificar escalamientos, o cualesquiera otros instrumentos de delito; si se hubiere visto cerca del sitio a la hora o momento en que se realizó el hecho; o si algún artículo que le pertenezca se encontrare en o cerca del lugar en que se cometió el hurto, como a la misma hora más o menos en que se cometiere el hurto; si correspondiera la impresión de sus zapatos u otros artículos de vestir con las marcas o señales dejadas por los ladrones; si hubiere tratado de hacer desaparecer alguna marca o señal de identidad que tuvieren los artículos hurtados, o tratado de corromper o sobornar a las partes o funcionarios de la justicia, éstas y toda otra circunstancia por el estilo, se considerarán justamente como que arrojan luz y explican el hecho de la posesión, y hacen moralmente cierta la conclusión de que semejante posesión sólo puede atribuirse a un origen delictivo y no puede explicarse de otro modo."

*Rivera*, 70 D.P.R. 570 (1949) y *Pueblo* v. *Rosado*, 78 D.P.R. 436, 440 (1955). Y aunque no son todo lo claras y precisas que debieran cumplen sustancialmente con lo requerido por la ley y la jurisprudencia para estos casos. Esto dispone también del decimoquinto error.

Mediante el decimocuarto error el apelante apunta que el juez de instancia cometió error al no instruir al jurado, al efecto de que la embriaguez según se estableció por la defensa eximía de responsabilidad criminal en el caso de portar armas y al decirle al jurado que "queda violada la ley con la simple portación del arma cargada independientemente de los fines para que se porte o con motivo o con qué intención se porta".

█ Así es el delito de portar armas. Véase *Pueblo* v. *Rivera*, 75 D.P.R. 425 (1953) y cf. *Pueblo* v. *Bou*, 64 D.P.R. 466 (1945), un caso de adulteración de leche, donde el acusado, transportador de la leche, no tenía llave del candado que cerraba el jarrón. Sólo había dos llaves una del dueño de la vaquería, otra del dueño del puesto, a quien se destinaba. En el camino un inspector de sanidad lo detuvo. Le explicó la situación y fueron al puesto para abrir el candado. La leche salió adulterada. Fue procesado y condenado y en apelación confirmamos ya que la ley no requiere al igual, que en portar armas, intención.

Para que el último error que queda por discutir prospere, el propio apelante admite que tendríamos que revocar a *Pueblo* v. *Fonseca*, 79 D.P.R. 36 (1956) y solicita que eso hagamos, pero los argumentos que aduce no nos convencen.

*No habiéndose cometido ninguno de los errores señalados, procede que se confirmen las sentencias apeladas.*