EL PUEBLO DE PUERTO RICO, peticionario, *v.* CARLOS RUBÉN GUZMÁN CAMACHO, acusado y recurrido.

*Número:* O-84-341      *Resuelto:* 26 de diciembre de 1984

*Doris Zoé Pons Pagán, Procuradora General Auxiliar*, abogada de El Pueblo, peticionario; *Jorge Roberto Feliciano*, abogado del recurrido.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

Los intereses de la justicia no son, exclusivamente, los del Pueblo, o los del acusado: son los de la sociedad toda interesada en que lo justo triunfe sobre lo injusto. *Pueblo* v. *Arenas*, 39 D.P.R. 16, 18 (1929).

Con este derrotero en mente, a petición del Estado, evaluamos la juridicidad de la desestimación de la acusación contra Carlos R. Guzmán Camacho por tentativa de asesinato, pendiente ante el Tribunal Superior, Sala de Ponce. Dicho foro concluyó que "someter nuevamente al acusado a juicio constituía una doble exposición".

I

El primer proceso comenzó a ventilarse el 1ro de diciembre de 1982. El Ministerio Público estaba representado por el fis-

cal Lic. José I. Rivera. Se desinsaculó el jurado. Declararon dos testigos de cargo. Al día siguiente otro más. Entonces el tribunal decretó un receso. Luego de dos transferencias, se fijó la continuación para el 15 de marzo. Ese día el Fiscal de Distrito, Lic. Pedro Goyco, informó que el fiscal José I. Rivera había sido asesinado y él no estaba en condiciones de continuar el juicio. Solicitó la disolución del jurado. El tribunal accedió por el fundamento de que esa muerte violenta constituía justa causa. El acusado se opuso. ([1])

Subsiguientemente se sometió al acusado Guzmán Camacho a nuevo juicio. Éste planteó que ello constituía una doble exposición vedada por el Art. II, Sec. 11 de nuestra Constitución que reza: "Nadie será puesto en riesgo de ser castigado dos veces por el mismo delito." El tribunal de instancia, por voz de otro magistrado, así lo decretó.

## II

■ Resolvemos que el asesinato en Ponce del representante del Ministerio Público, Lic. José I. Rivera, constituyó un evento de tal magnitud e impacto, que constitucional y procesalmente justificó plenamente la disolución del jurado y la descontinuación del juicio original seguido contra Guzmán Camacho. No impide el segundo.

El procesamiento de causas criminales, por el Ministerio Fiscal, constituye una gestión clave e indispensable en el sistema de administración de justicia criminal, en el cual participan otras dos figuras centrales: los jueces y abogados defensores. Su importancia queda resaltada al considerar que el método de litigación tradicional está fundado en el *sistema de adversario* cuya importancia queda explicada del siguiente modo: "La esencia del sistema de adversario es el reto. La subsistencia de nuestro sistema de justicia criminal y el valor que representa depende de una constante búsqueda e inte-

---

([1]) Nuestra intervención se produce porque el acusado objetó tal disolución. Un acuerdo entre las partes hubiese obviado este trámite.

rrogantes creadoras de las decisiones de la autoridad en todas las etapas del proceso." (Citas omitidas.) *Informe de la Comisión para el Estudio de la Fiscalía y Representación Legal del Estado* de 26 de septiembre de 1974, Consejo sobre la reforma de la justicia en Puerto Rico, págs. 1–2.

La Regla 144(d) de Procedimiento Criminal, en lo pertinente autoriza la disolución del jurado antes del veredicto, si "[s]e hubiere cometido algún error o se hubiere incurrido en *alguna irregularidad durante el proceso que*, a juicio del tribunal, *le impidiere al jurado rendir un veredicto justo e imparcial*". (Énfasis suplido.) 34 L.P.R.A. Ap. II, R. 144(d). Una vez ejercida con cautela esa facultad, "la causa podrá ser juzgada nuevamente". Id., R. 144. La razón que inspira la norma es que "el derecho valioso de un acusado a que su juicio se termine por el tribunal a veces debe quedar subordinado al interés público en juicios justos que terminen en fallos justos". *Pueblo* v. *Arteaga Torres*, 93 D.P.R. 148, 153 (1966).

Al amparo de la citada regla, no se cuestiona que la muerte violenta de uno de los protagonistas forenses que intervienen en el juicio —como lo es el fiscal— es catalogable como una irregularidad durante el proceso. Tomamos conocimiento judicial del despliegue que el crimen tuvo en los distintos medios informativos del país y la indignación pública que generó en múltiples sectores. No podemos ignorarlo.

### III

Los jurados son seres humanos. Esa condición es inseparable del proceso de administrar justicia. (²) Sin embargo, como juzgadores de hechos no les hemos atribuido una sensibilidad extrema. *Pueblo* v. *Dones Arroyo*, 106 D.P.R. 303, 311 (1977); *Pueblo* v. *Andrades González*, 83 D.P.R. 849, 860 (1961); *Pueblo* v. *Rivera Romero*, 83 D.P.R. 471, 483 (1961).

---

(²) "[S]e reconoce la realidad de que los jurados a veces atemperan la ley a su propio sentido de justicia y así atemperada la aplican." *Pueblo* v. *Medina Ocasio*, 98 D.P.R. 302, 305 (1970).

La doctrina reconoce que no todo error o irregularidad en un proceso macula la imparcialidad de un veredicto. Tiene que ser grave, perjudicial, sustancial e insubsanable. Hemos de concluir que el crimen de uno de los actores principales de alguna forma les afectó. Es natural, lógico y humano. El asesinato razonablemente generó varios sentimientos: o una simpatía hacia el fiscal ultimado y la causa que representaba; o un desagrado o repulsión hacia el acusado; o ninguna reacción anímica. Esto último representaría una apatía colectiva o frialdad emocional poco común de seres humanos normales.

¿Puede negarse aun en el campo de lo especulativo, que este trágico acontecimiento no impactó potencialmente a los jurados? "El jurado no está habituado a la prudencia del juez, que espera conocer la totalidad de las pruebas, para luego inferir de ellos su convicción. Por el contrario, lo impresionan las pequeñeces y se torna daltónico en cuanto a pruebas más graves. A veces una fruslería procesal, a la cual no le daría importancia alguna el técnico, llega a ser como el punto céntrico de orientación mental, suficiente para convencer en uno u otro sentido." E. Altavilla, *Sicología Judicial*, Ed. Depalma, Buenos Aires, 1970, Vol. II, págs. 1198–1199. ¿Constituyó una fruslería el asesinato y consabida ausencia procesal del fiscal Rivera?

Cualesquiera de las alternativas apuntadas sostienen la juridicidad de la disolución decretada. La imparcialidad de un jurado y su veredicto quedan igualmente tronchados cuando la irregularidad sustancial en el proceso, beneficia o crea animosidad hacia cualesquiera de las partes protagonistas. Tan malo es una ventaja hacia el Ministerio Fiscal como hacia la defensa. "La justicia debe ser igual para todos." *El Pueblo* v. *García*, 32 D.P.R. 727, 731 (1924).

Solamente el juez que presidió el primer proceso tuvo ante sí todos los elementos de juicio visibles e intangibles de los efectos del crimen del fiscal Rivera. Apreció la atmósfera que esa muerte violenta creó. Nosotros carecemos de esa per-

cepción. Lo prudente es que respetemos su discreción, pues "[a]l pasar sobre la actuación de un tribunal decretando la disolución del jurado, aun sobre la objeción del acusado, es preciso considerar que el juez de instancia está mejor situado para hacer una evaluación inteligente de la situación que motiva la disolución". *Pueblo* v. *Arteaga Torres*, supra, pág. 153. Después de todo, "la diferencia de criterio que en todo caso pudiera haber entre su juicio y el nuestro en revisión sería una diferencia sólo de grado en la apreciación de los factores aludidos y, en deferencia a su posición de observador perspicaz de los hechos ocurridos y sus consecuencias sobre el proceso, no deberíamos sustituir su juicio". *Piñero Agosto* v. *Tribunal Superior*, 94 D.P.R. 204, 219 (1967).

*Se dictará sentencia y revocará la desestimación decretada.*

El Juez Asociado Señor Irizarry Yunqué emitió opinión disidente a la cual se une el Juez Presidente Señor Trías Monge.

—O—

Opinión disidente emitida por el Juez Asociado Señor Irizarry Yunqué a la cual se une el Juez Presidente Señor Trías Monge.

La decisión que hoy toma este Tribunal pasa por alto la bien sentada norma de que para salvar el principio constitucional de que un acusado no puede ser puesto en riesgo de ser castigado dos veces por el mismo delito, no debe disolverse un jurado antes de rendir veredicto a menos que de las circunstancias concurrentes se desprenda una "necesidad manifiesta" de así hacerlo. Por ello, disiento respetuosamente.

I

Los hechos relevantes y pertinentes a la cuestión aquí planteada son los siguientes, según surgen de los autos originales. Se acusó al aquí recurrido del delito de tentativa de asesinato, imputándosele que el 27 de junio de 1981 agredió en

la cabeza, con un nivel, a Jorge Luis León Vázquez, con intención de matarlo. En la investigación y procesamiento participaron varios fiscales de Ponce. El fiscal Julio León practicó la investigación y tomó declaraciones juradas a los testigos. El fiscal José E. Medina representó al Ministerio Público en la vista preliminar, presentó la prueba para sostener causa probable, e interrogó a los testigos y escuchó el contrainterrogatorio conducido por el abogado defensor. En el acto del juicio intervino el fiscal José I. Rivera para sostener la acusación.

El juicio comenzó el 1ro de diciembre de 1982, al quedar constituido el jurado. Prestaron testimonio dos testigos de cargo. El día siguiente, luego de declarar un tercer testigo de cargo, el juez que presidía, Hon. Ramón E. Febus Bernardini, decretó un receso para continuar el juicio el 18 de enero de 1983 —más de mes y medio después— porque tenía que acudir a una cita médica y, además, atender una asignación en Carolina.

El 18 de enero no pudo reanudarse el juicio debido a que el fiscal Rivera tuvo que atender otro caso. (¹) Se señaló la continuación para el 8 de febrero y también tuvo que aplazarse, esta vez para el 15 de marzo, por compromisos de ambas partes.

El 15 de marzo, al llamarse el caso, compareció el Fiscal de Distrito, Lcdo. Pedro Goyco Amador, e informó al tribunal que el fiscal Rivera había sido asesinado, que no se habían podido localizar sus notas, y que como el jurado había sido desinsaculado hacía cuatro meses, debía decretarse su disolución y celebrarse un nuevo juicio. Por sobre la oposición de la defensa, el juez accedió a la solicitud del fiscal.

El abogado del acusado planteó reiteradamente que la muerte del fiscal Rivera no constituía justa causa para la

---

(¹)Participaba en un juicio seguido contra José Camacho Báez en otra sala. Nada hay en los autos indicativo de relación alguna entre dicho acusado y el aquí recurrido, no obstante llevar ambos el apellido Camacho.

disolución del jurado; que solamente tres testigos habían declarado y que sus testimonios podían ser transcritos y otro fiscal continuar representando al Estado; que tanto el fiscal León como el fiscal Medina conocían la prueba, por haber intervenido en etapas anteriores del caso, conforme se ha señalado; que comenzar el juicio nuevamente constituía una segunda exposición, en violación de la prohibición constitucional. El Juez Febus sostuvo su dictamen, y se señaló el segundo juicio para el 12 de abril de 1983.

En esta segunda etapa intervino como juez el Hon. José M. Ayala Cádiz, quien por resolución de 17 de febrero de 1984, a petición de la defensa, desestimó la acusación por entender que no se justificó la disolución del jurado y que someter al acusado a nuevo juicio violaba su derecho a no ser expuesto dos veces por el mismo delito. Contra lo así dispuesto instó ante nos recurso de *certiorari* el Ministerio Público.

## II

La Regla 144, inciso (d), Reglas de Procedimiento Criminal, ha sido invocada como justificación de la disolución del jurado y la celebración de un segundo juicio. Dispone así:

El tribunal podrá ordenar la disolución del jurado antes del veredicto en los siguientes casos:

. . . . . . . .

(d) Si se hubiere cometido algún error o se hubiere incurrido en alguna irregularidad durante el proceso que, a juicio del tribunal, le impidiere al jurado rendir un veredicto justo e imparcial.

. . . . . . . .

En todos los casos en que el jurado fuere disuelto según lo provisto en esta regla, la causa podrá ser juzgada nuevamente.

Esta disposición constituye una excepción a la prohibición de la Carta de Derechos de nuestra Constitución, que dice: "Nadie será puesto en riesgo de ser castigado dos veces por el mismo delito." Art. II, Sec. 11. Fue tomada de la Quinta En-

mienda de la Constitución federal, Art. V, que señala que "ni podrá nadie ser sometido por el mismo delito dos veces a un juicio que pueda ocasionarle la pérdida de la vida o la integridad corporal". Por tratarse de una excepción a ese principio de fundamental importancia para el Pueblo, la Regla 144 citada tiene que interpretarse restrictivamente. Expresó este Tribunal en *Pueblo* v. *Arteaga Torres*, 93 D.P.R. 148, 150–151 (1966):

> El hecho de que al disolver un jurado *antes del veredicto* —sin que sea a petición o con la aquiescencia del acusado—, el Tribunal actúe bajo los supuestos del apartado (d) arriba transcrito de la Regla 144, no establece *per se* la validez de un segundo proceso por el mismo delito. El fundamento de lo dicho es que existe la garantía de orden constitucional, que protege al acusado no contra ser castigado dos veces sino contra *ser puesto en riesgo* de ser castigado dos veces por el mismo delito. *Downum* v. *United States*, 372 U.S. 734, 736; *Green* v. *United States*, 355 U.S. 184, 188; *United States* v. *Ball*, 163 U.S. 662, 669.

En *Wade* v. *Hunter*, 336 U.S. 684, 689 (1949) expresó el Tribunal Supremo federal, refiriéndose a la prohibición contra doble exposición de la Quinta Enmienda, que significa "un valioso derecho [del imputado] a que [ese] juicio sea completado por un tribunal en particular". (Traducción nuestra.)

Hace ciento sesenta años, en *United States* v. *Pérez*, 9 Wheat. 579 (1824), el Tribunal Supremo federal adoptó la norma de "necesidad manifiesta" como justificativa de la excepción que consideramos. Esa norma fue adoptada por nosotros en *Pueblo* v. *Arteaga Torres*, supra, pág. 151, donde dijimos:

> Por lo tanto, la cuestión ante nos debe afrontarse no sólo a la luz de la autoridad permisible de la Regla 144 sino satisfaciendo además aquellas normas constitucionales que rigen la materia y que también harían permisible o no un segundo proceso sin que se violara la garantía. Puede decirse en síntesis de esas normas, que cuando ocurran circunstancias en

que los fines de una justicia sustancial no puedan lograrse y exista una manifiesta necesidad de así hacerlo, de modo que no se derroten los mejores fines de la justicia, un juicio puede descontinuarse y disolverse el jurado sin el consentimiento del acusado o aun ante su objeción, sin que por ese solo hecho un segundo enjuiciamiento por el mismo delito quede al margen de la garantía constitucional. Es norma complementaria de lo anterior que la descontinuación de un juicio en esas circunstancias debe ser producto de una sana y juiciosa discreción; la facultad debe ejercitarse con la mayor cautela, por consideraciones obvias de peso, y ante una necesidad manifiesta de así hacerlo. *United States* v. *Tateo*, 377 U.S. 463; *Gori* v. *United States*, 367 U.S. 364, 367; *Wade* v. *Hunter*, 336 U.S. 684; *United States* v. *Pérez*, 9 Wheat. 579.

La norma ha seguido siendo respetada hasta nuestros días. Véanse *Illinois* v. *Somerville*, 410 U.S. 458 (1973); y *Oregon* v. *Kennedy*, 456 U.S. 667, 672 (1982). En este último caso, citando a *Wade* v. *Hunter*, supra, se señala que el estándar de "necesidad manifiesta" debe proveer "suficiente protección a los intereses del imputado de que su caso sea finalmente decidido *por el jurado que fuera originalmente seleccionado*". (Énfasis suplido.)

¿Qué necesidad manifiesta revelan los hechos que consideramos, como justificación para la disolución del jurado y la celebración de un segundo juicio? Ninguna. La opinión de la mayoría de este Tribunal, en la pág. 36, postula como justificación que el asesinato del fiscal Rivera "constituyó un evento de tal magnitud e impacto, que constitucional y procesalmente justificó plenamente la disolución del jurado y la descontinuación del juicio". Dicho con todo respeto, toda muerte violenta es un evento de magnitud e impacto, pero de ahí a deducir que continuar el juicio provocaría un fracaso de la justicia es una conjetura que no satisface la norma. Si acaso, el impacto en el jurado debía ser de pena, como es natural por la inusitada muerte del fiscal Rivera, y de alarma y reprobación y enojo por la manera como se causó su muerte. Pero ello no justifica, sin más, concluir que se perturbase su ánimo de

tal manera que no pudiese rendir un veredicto justo e imparcial después de aquilatar toda la prueba ante su consideración. Pudo interrogarse a los miembros del jurado sobre su estado de ánimo, y no se hizo, y pudo ser instruido adecuadamente, antes de sometérsele el caso para su decisión.

Aparte de la ausencia total en los autos de elementos que justifiquen concluir que el jurado no estaba en condiciones de evaluar la prueba objetivamente, (²) la defensa ofreció alternativas, a que nos hemos referido, y que la opinión de este Tribunal pasa por alto. El fiscal Goyco Amador expresó que no se habían localizado las notas del fiscal Rivera. Ello se subsana, de mejor manera, mediante la transcripción de los testimonios vertidos por los tres testigos que habían declarado, y que tanto el fiscal León como el fiscal Medina conocían. Nada hay en los autos indicativo de que esos fiscales no pudieran continuar la representación del Ministerio Público. Ninguno fue llamado a declarar sobre tal imposibilidad.

### III

No puedo concluir sin expresar mi preocupación por las dilaciones habidas en el trámite de este caso en instancia. Es lamentable e inquietante que, comenzado un juicio ante jurado, tenga que aplazarse su continuación por cuatro meses, como ocurrió en este caso. Y el trámite posterior a la disolución del jurado también deja mucho que desear.

Del 15 de marzo de 1983, en que se disolvió el jurado, hasta que se ordenó la desestimación de la acusación, el 17 de febrero de 1984, transcurrieron once meses. Se notificó al fiscal sobre dicha orden el 27 de febrero de 1984. El Ministerio Público dejó transcurrir más de tres meses para instar ante este Tribunal el recurso que consideramos.

---

(²) Es de notar que en el caso de Camacho Báez, el otro caso cuyo juicio se ventilaba en otra sala, y en que también intervenía el fiscal que fuera asesinado, no obstante no haber sido sometido aún al jurado, no se solicitó ni se concedió la disolución del jurado.

Estas dilaciones pueden tener el efecto de burlar el derecho del imputado a un juicio rápido; derecho que también lo comparte el interés de la sociedad.

## IV

Por todas las consideraciones expresadas en este disenso, la resolución del Juez Ayala Cádiz debería ser confirmada.