EL PUEBLO DE PUERTO RICO, apelado, *v.* MELVIN SUÁREZ FERNÁNDEZ y ABIGAIL ORTEGA QUIÑONES, acusados y apelantes.

*Número:* CR-82-49     *Resuelto:* 15 de enero de 1986

*Elina Arroyo Acevedo, Margarita Carrillo,* de la Sociedad para Asistencia Legal, abogadas del apelante; *Miguel Pagán, Procurador General Interino, Ricardo E. Alegría Pons* y *Miguel A. Santana Bagur, Procuradores Generales Auxiliares,* abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR IRIZARRY YUNQUÉ emitió la opinión del Tribunal.

Toda muerte violenta conmueve las fibras íntimas de la sensibilidad del ser humano. Pero cuando se asesina a seres indefensos y a la manera de la orgía de terror que revelan los hechos de este caso, tiene que conmoverse en indignación la conciencia ciudadana y no puede menos que sentirse conturbada.

Nos preocupa hondamente que este tipo de crimen pueda haber llegado a ser hoy día en nuestra sociedad un estilo que ya no puede llamarse excepcional. La adicción a drogas, subyacente en el móvil del robo y los asesinatos de este caso, parece ser parte de ese estilo que adormece la sensibilidad y despierta los instintos viciosos de la fiera. Tenemos que hacernos eco del clamor de nuestro pueblo, que vive en constante temor ante la ola incontrolada de criminalidad que lo agobia, para que se tome acción pronta y positiva que conjure este mal de nuestro tiempo.

## I

Los aquí apelantes, Melvin Suárez Fernández y Abigail Ortega Quiñones, fueron convictos, en juicio por jurado, de los delitos de asesinato en primer grado (dos casos), robo, secuestro y varias infracciones a la Ley de Armas.

La prueba de cargo consistió de los testimonios de Freddie Villegas Rodríguez, joven participante en los hechos delictuosos a quien el Ministerio Público concedió inmunidad —contaba 17 años en la fecha de los hechos— y Pablo Suárez Batista. La de defensa se limitó al testimonio de José Orlando Cordero Falú, también participante confeso, quien contaba quince años para la fecha de su ocurrencia.

Quedó establecido que Freddie y José Orlando se reunieron a principios de julio de 1980 con Agustín Franco Cáceres para acordar los detalles de un robo a efectuarse en una residencia en Villa Carolina en que vivían dos damas dueñas de una joyería en que Agustín era empleado. Se unieron al grupo Abigail Ortega Quiñones y Melvin Suárez Fernández, los aquí apelantes. Melvin proveyó un revólver, "lo que hace falta", según dijo. Se valieron todos de un amigo vecino llamado Rubén, que por $5.00 les proveyó transportación hasta las cercanías del lugar a ser asaltado, y allá fueron. Freddie se encontraba "estimulado", pues "se había metido tres decks de heroína".

Llegaron a la casa. Agustín abrió el portón de entrada y penetraron. Las dos damas estaban sentadas a la mesa. Era la hora de la comida. Agustín, armado con el revólver de Melvin, encañonó a las dos mujeres. Orlando tomó una cartera que estaba sobre la mesa y sustrajo de ella otro revólver. Agustín ordenó a Freddie que llevara a la señora mayor a uno de los cuartos. Así lo hizo éste, procediendo a atarla de pies y manos. Así atada, fue matada por Abigail a puñaladas, valiéndose de un cuchillo de la cocina. Mientras tanto, los otros rebuscaban la casa, cogieron el dinero y las prendas que quisieron, y se llevaron a la otra mujer en un automóvil Volvo

propiedad de ellas. En él se fueron todos excepto Abigail, que decidió quedarse y se fue "caminando".

Se orientaron en el automóvil hacia un paraje solitario en la carretera de Trujillo Alto a Gurabo. Ya era de noche. Se detuvieron. Allí Agustín trató de ultrajar a la mujer y no pudo. Entonces le ordenaron bajarse y que corriera. Cuando ésta así lo hizo, encendieron las luces delanteras del vehículo y mientras enfocaban a la mujer que corría, abrieron fuego contra ella Orlando y Agustín con los revólveres que portaban. La infortunada al fin cayó. Entonces la ultimaron a balazos mientras yacía boca abajo a la orilla de la carretera. El patólogo halló siete heridas de bala, todas por la espalda, hechas a distancia.

La variante importante entre el testimonio de Freddie, testigo de cargo, y el de José Orlando fue que éste declaró haber sido él quien mató a puñaladas a la señora en su casa. Este testigo era inimputable de delito debido a su edad. El jurado no le creyó.

## II

La apelación ante nos se basa en cinco alegados errores que pasamos a considerar separadamente.

PRIMER ERROR

Incidió la Ilustre Sala de instancia al declarar sin lugar la solicitud de la defensa de que se desestimaran los cargos al amparo de la sección 11 de la Carta de Derechos de la Constitución del Estado Libre Asociado de Puerto Rico, de la Quinta Enmienda de la Constitución de los Estados Unidos y de la Regla 64(e) de las de Procedimiento Criminal.

Este señalamiento se basa en que, comenzado el juicio contra los apelantes y habiéndose decretado por el juez la detención del proceso y la disolución del jurado (*mistrial*) [1] debido a determinada conducta de los fiscales, se negó el tribunal de instancia a desestimar las acusaciones, y por sobre la ob-

---

[1] A falta de un vocablo en español equivalente al término *mistrial*, seguiremos usando el vocablo en inglés en aras de la brevedad.

jeción de los apelantes se les sometió a juicio nuevamente, recayendo entonces los fallos condenatorios y las sentencias que son objeto del presente recurso.

El *mistrial* fue decretado a solicitud de la defensa luego de que el magistrado llamara la atención a los fiscales en varias ocasiones, porque se hicieron ostensibles movimientos que permitían al jurado ver fotografías de las occisas que no fueron admitidas como prueba; mantenía fotografías sobre su mesa que eran visibles para el jurado y que no formaban parte de la prueba; un fiscal saludó a los miembros del jurado cuando éstos se retiraban para almorzar, deseándoles "un buen almuerzo" a cada uno; hicieron preguntas sobre parches con huellas dactilares a pesar de la prohibición expresa que hiciera el juez, y se incurrió en conducta poco cortés para con el magistrado.

Al señalarse nuevamente la causa para juicio se discutió moción de desestimación de los apelantes en que alegaban que el nuevo juicio constituiría una doble exposición. Se dio audiencia a las partes para oír prueba sobre el *mistrial* y escuchar sus argumentos. Quedó establecido que el fiscal que así se comportó había sufrido un accidente automovilístico la noche antes, quedando inconsciente y siendo atendido en un hospital, habiendo sufrido lesiones en todo el cuerpo; tuvo una lesión en el hombro izquierdo con separación de alrededor de siete grados de la clavícula, lo cual le producía mucho dolor y espasmos; que aun en esas condiciones acudió al tribunal para la continuación del juicio; que no podía caminar libremente. Otra fiscal que intervino declaró sobre las fotografías en la mesa, que se proponían ofrecerlas y que al llamárseles la atención las viró para que no se vieran.

El juez que intervino en la moción concluyó que aunque esta conducta fue impropia no medió mala fe ni tuvo la intención de obligar a la defensa a solicitar un *mistrial*. (²)

---

(²) De esta resolución se acudió ante nos vía *certiorari*. Nos negamos a revisar sin perjuicio de que se hiciera el planteamiento en apelación.

■ De ordinario cuando se decreta un *mistrial* a petición de la defensa ello equivale a una renuncia al derecho constitucional del acusado a no ser juzgado dos veces por el mismo delito. En *Lugo* v. *Tribunal Superior*, 99 D.P.R. 244, 247–248 (1970), señalamos:

> Es claro que cuando se disuelve un jurado antes de rendir veredicto no se puede procesar de nuevo al acusado a menos que éste hubiere consentido a la disolución, o que la misma procediese por concurrir las circunstancias que se enumeran en la Regla 144 de las de Procedimiento Criminal de 1963. Disolver un jurado sin autorización legal equivale a una absolución. Ver *Paulson* v. *Superior Court of El Dorado County*, 372 P.2d 641 (Cal. 1962).

■ Bajo la citada Regla 144 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R. 144, el juez puede ordenar la disolución del jurado antes de recaer veredicto, entre otros casos "[s]i se hubiere cometido algún error o se hubiere incurrido en alguna irregularidad durante el proceso que, a juicio del tribunal, le impidiere al jurado rendir un veredicto justo e imparcial". (Inciso (d).) En este, como en los demás casos señalados por dicha regla, "la causa podrá ser juzgada nuevamente". (Última oración de la Regla 144.) [3]

Valga aclarar que esta afirmación no es absoluta. Señalamos en *Pueblo* v. *Arteaga Torres*, 93 D.P.R. 148, 151 (1966):

> Por lo tanto, la cuestión ante nos debe afrontarse no sólo a la luz de la autoridad permisible de la Regla 144 sino satisfaciendo además aquellas normas constitucionales que rigen la materia y que también harían permisible o no un segundo proceso sin que se violara la garantía. Puede decirse en síntesis de esas normas, que cuando ocurran circunstancias en que los fines de una justicia sustancial no puedan lograrse y exista una manifiesta necesidad de así hacerlo, de modo

---

[3] No se discute que en este caso el decreto de *mistrial* estuvo justificado al amparo del citado inciso (d) de la Regla 144 de Procedimiento Criminal, a diferencia del planteamiento objeto de consideración en *Pueblo* v. *Guzmán Camacho*, 116 D.P.R. 34 (1984).

que no se derroten los mejores fines de la justicia, un juicio puede descontinuarse y disolverse el jurado sin el consentimiento del acusado o aun ante su objeción, sin que por ese solo hecho un segundo enjuiciamiento por el mismo delito quede al margen de la garantía constitucional. Es norma complementaria de lo anterior que la descontinuación de un juicio en esas circunstancias debe ser producto de una sana y juiciosa discreción; la facultad debe ejercitarse con la mayor cautela, por consideraciones obvias de peso, y ante una necesidad manifiesta de así hacerlo.

■ Las normas enunciadas en *Lugo* v. *Tribunal Superior*, supra, y *Pueblo* v. *Arteaga Torres*, supra, tienen que atemperarse, no obstante, a la realidad de que el decreto de *mistrial* muy bien podría ser provocado intencionalmente por el fiscal para tomar una ventaja indebida, que no debe premiarse. Podría darse el caso, por ejemplo, de que el fiscal no esté a gusto con el jurado seleccionado o no haya venido bien preparado y busque provocar el *mistrial* para tener una segunda oportunidad. Si tal cosa se permitiese se quebrantaría el basamento del debido proceso de ley y sin duda se estaría violentando la prohibición constitucional contra la doble exposición.

El problema ha sido abordado por el Tribunal Supremo federal en *United States* v. *Dinitz*, 424 U.S. 600 (1976), y recientemente en *Oregon* v. *Kennedy*, 456 U.S. 667 (1982). En *United States* v. *Dinitz*, supra, el Tribunal resolvió que si bien el juez de instancia fue más allá de lo debido (*over-reached*) al ordenar el retiro de un abogado del acusado y provocar con ello un *mistrial*, ello no impedía un segundo proceso toda vez que no se demostró que la expulsión del abogado se hiciera de mala fe y para inducir a la defensa a solicitar un decreto de *mistrial*.

En *Oregon* v. *Kennedy*, supra, el Tribunal sentó la doctrina de que para que se impida un nuevo proceso en obediencia a la cláusula constitucional de doble exposición (Enmiendas V y XIV), el *mistrial* no debe ser el resultado de una conducta intencional del fiscal o del juez con el propósito de obli-

gar a la defensa a solicitarlo. Este caso limitó la doctrina de *United States* v. *Dinitz*, supra, al decir, en las págs. 675-676:

Prosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion, therefore, does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause. A defendant's motion for a mistrial constitutes "a deliberate election on his part to forgo his valued right to have his guilt or innocence determined before the first trier of fact." *United States* v. *Scott,* 437 U.S. 82, 93 (1978). Where prosecutorial error even of a degree sufficient to warrant a mistrial has occurred, "[t]he important consideration, for purposes of the Double Jeopardy Clause, is that the defendant retain primary control over the course to be followed in the event of such error." *United States* v. *Dinitz, supra,* at 609. *Only where the governmental conduct in question is intended to "goad" the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion.* (Énfasis nuestro.)

Más adelante, en la pág. 679, señaló el Tribunal:

. . . We do not by this opinion lay down a flat rule that where a defendant in a criminal trial successfully moves for a mistrial, he may not thereafter invoke the bar of double jeopardy against a second trial. But we do hold that the circumstances under which such a defendant may invoke the bar of double jeopardy in a second effort to try him are limited to those cases in which the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial.

Aplicada esta norma a los hechos ante nos es forzoso concluir que no se cometió el error imputado. El tribunal de instancia resolvió como cuestión de hecho, luego de oír los testimonios del juez que decretó el *mistrial* y de los fiscales que intervinieron en el primer juicio, que aunque la conducta de los fiscales fue impropia no medió mala fe ni tuvo la intención

de obligar a la defensa a solicitar el *mistrial*. Hemos examinado los autos y tal determinación encuentra apoyo en la prueba desfilada.

### SEGUNDO ERROR
Cometió error el Honorable Tribunal sentenciador al declarar sin lugar una solicitud de disolución del jurado.

Este señalamiento se basa en el siguiente incidente. El agente Magín Ruisánchez, testigo de cargo, declaró que dirigió la investigación de los sucesos por los que se procesaba a los acusados. Señaló que en la etapa investigativa entrevistó a Freddie Villegas, quien prestó declaración sobre los hechos luego de ser debidamente advertido de sus derechos. También interrogó a José Orlando Cordero Falú. Manifestó que Cordero Falú le "dijo la misma versión sobre los hechos que le hiciera Freddie Villegas".

La defensa objetó la contestación ofrecida por el agente Ruisánchez. En ausencia del jurado solicitó la disolución del mismo por haberse ocasionado un daño irreparable a los acusados. Debe recordarse que Villegas declaró que Abigail Ortega dio muerte a puñaladas a una de las víctimas. La otra perjudicada fue conducida a un paraje solitario donde José Orlando Cordero y Agustín Franco le dieron muerte de varios disparos. El tribunal declaró sin lugar el planteamiento de la defensa. Procedió a impartir instrucciones especiales al jurado por haber declarado el testigo sobre unos extremos ya declarados inadmisibles por el tribunal.

■ No tienen razón los apelantes. Es cierto que el jurado pudo haber pensado que ambos coautores compartían la misma versión de los hechos. No obstante, esta manifestación fue hecha antes de que José Orlando Cordero Falú prestara su declaración en corte abierta. El jurado tuvo la oportunidad de ver y oír al testigo prestar declaración y adjudicar su credibilidad. Unas instrucciones especiales y oportunas, unido al testimonio posterior de José Orlando, lograron evitar el ale-

gado efecto perjudicial de la manifestación sobre la defensa de los acusados. Dichas instrucciones no fueron objetadas por la defensa ni solicitó ésta alguna instrucción en especial.

TERCER ERROR

Cometió grave error el Tribunal sentenciador al decretar que una inferencia hecha por el Ministerio Público durante su informe de rectificación estaba apoyada en la prueba.

■ La Regla 136 de Procedimiento Criminal dispone que una vez terminada la prueba, las partes rendirán sus informes. El fiscal podrá cerrar brevemente el debate limitándose a rectificar el informe de la defensa.

En *Pueblo* v. *Fournier*, 80 D.P.R. 390, 407–408 (1958), dijimos:

> . . . La determinación de las cuestiones de hecho por un jurado exige inferencias que deben derivarse de la evidencia testifical y documental presentada. Para llamar la atención del jurado respecto a dichas inferencias, tanto el fiscal como la defensa tienen que presentarlas en sus argumentos. Por eso, en sus informes finales al jurado, el representante del ministerio público y el abogado defensor pueden comentar la evidencia presentada y *tienen amplia libertad para hacer conclusiones, inferencias, deducciones y argumentos derivados de la misma. No importa que dichas conclusiones, inferencias, deducciones y argumentos sean improbables, ilógicos, erróneos o absurdos.* Cualquier argumento basado en la evidencia normalmente es propio y el requisito de que exista base en la evidencia se interpreta muy liberalmente. (Énfasis suplido.)

Esta norma ha sido reiterada en varias ocasiones. Véanse *Pueblo* v. *Ortiz Rodríguez*, 103 D.P.R. 368 (1975); *Pueblo* v. *González Colón*, 110 D.P.R. 812 (1981).

En su turno final, el fiscal tomó en sus manos el cuchillo y la foto marcada *Exhibit* (5) (e) de El Pueblo, que ilustra el estado en que se encontraba el baño (papeles tirados en el piso, manchados) de la residencia donde ocurrieron los hechos. El fiscal quiso explicar la razón por la cual en el cuchillo uti-

lizado para dar muerte a Sara Olga Hernández no apareció huella de la coacusada Abigail Ortega. Manifestó que los papeles habían sido usados para limpiar una superficie ensangrentada. Infirió que *alguien* había limpiado el cuchillo con los papeles de baño que se reflejan en la foto. La defensa objetó esta inferencia, y el tribunal la declaró sin lugar por tener base en la prueba desfilada.

Se recordará que el testigo Freddie Villegas declaró que vio a "Abigail [la aquí apelante] apuñalando a la señora mayor con un cuchillo finito de cabo crema o blanco". El *Exhibit* 5(e) de El Pueblo —una fotografía— reproduce la forma en que se encontró el baño de la residencia en donde fue asesinada la señora Hernández. En dicha fotografía se pueden apreciar papeles manchados tirados en el piso.

El cuchillo debió estar ensangrentado cuando éste fue hallado por la Policía. Sin embargo, apareció sin rastro alguno de sangre. Si bien es cierto que la huella de José Orlando Cordero fue tomada de la hoja del cuchillo, no sería la forma indicada para agarrar un cuchillo con el propósito de apuñalar a alguien. José Orlando declaró que utilizó el cuchillo para apuñalar a una de las víctimas, sin embargo, no se encontraron sus huellas en el mango. Es lógico pensar que alguna persona limpió el cuchillo.

Para poder hacer la inferencia objetada, no era necesario que el Estado hubiese establecido con prueba directa que la apelante se dirigió al baño luego de ocurrir los hechos. Tampoco es necesario que la hubieran visto con papeles sanitarios, que llevara el cuchillo al referido baño o que alguien hubiera limpiado el arma. La inferencia hecha por el Ministerio Fiscal era lógica y válida y permisible conforme a Derecho.

### CUARTO ERROR

Erró el Honorable Magistrado de instancia al imponer a los acusados penas múltiples por los delitos por los que se les acusó y resultaron convictos.

En los dos casos por asesinato en primer grado se sentenció a los apelantes a reclusión perpetua. En el caso por el delito de secuestro se les impuso una pena de diez a quince años de reclusión. En el caso por el delito de robo se les sentenció a cumplir de diez a doce años de reclusión. Por las infracciones al Art. 8 de la Ley de Armas, 25 L.P.R.A. sec. 418, se les impuso una pena de tres a cinco años, y por las infracciones de los Arts. 4 y 6 de dicha ley, 25 L.P.R.A. secs. 414 y 416, se les impuso seis meses de reclusión. Se dispuso que las sentencias impuestas en los casos por asesinato en primer grado se cumplan de modo concurrente entre sí, pero consecutivas con las demás penas impuestas.

■ Los apelantes alegan que las sentencias impuestas constituyen castigos múltiples a un curso de conducta que perseguía una sola intención criminal. El Art. 63 del Código Penal, 33 L.P.R.A. sec. 3321, dispone, en lo aquí pertinente, lo siguiente:

> Salvo lo dispuesto en la sección siguiente, un acto u omisión penable de distintos modos por diferentes disposiciones penales, podrá castigarse con arreglo a cualquiera de dichas disposiciones pero en ningún caso bajo más de una.

■ En *Pueblo* v. *Meléndez Cartagena*, 106 D.P.R. 338 (1977), señalamos que el "acto" a que se refiere este artículo comprende no sólo un acto físico único sino que, en determinadas circunstancias, puede comprender un curso de acción. Esta doctrina sobre el concurso de delitos no opera, según expresamos en la pág. 345, cuando el acto genera más de una lesión. Y ese es el caso aquí. Los apelantes fueron a robar, pero además de robar, mataron a sus víctimas. Su curso de acción para lograr el objetivo de robar generó diversas lesiones y cada una constituyó un delito punible separadamente de las demás.

En cuanto a la apelante Abigail Ortega se plantea que, según la prueba, ésta participó solamente en el robo y en el

asesinato de una de las víctimas, y no debe responsabilizársele por la conducta seguida por sus compañeros luego que ella se alejó voluntariamente y los dejó.

■ No tiene razón. Cuando un delito ha entrado en la fase de su ejecución, como es el caso ante nos, no basta para exonerar a uno de los coautores que éste desista voluntariamente, sino que debe realizar actos dirigidos a evitar el resultado delictivo. *Pueblo* v. *Tribunal Superior*, 103 D.P.R. 755, 758–759 (1975). Además, el secuestro y asesinato de la otra víctima no puede catalogarse una acción independiente del robo y asesinato de la primera. El secuestro y asesinato de la segunda víctima se cometieron obviamente en protección de todos, para evitar ser identificados por ésta.

### QUINTO ERROR

No se estableció la culpabilidad de los apelantes más allá de duda razonable.

■ Este planteamiento es frívolo. Hubo dos versiones y el jurado no dio crédito al testigo de defensa José Orlando Cordero Falú. La prueba de cargo es suficiente en Derecho para sostener los veredictos rendidos por el jurado. No estamos autorizados a intervenir con su función aquilatadora de credibilidad. *Pueblo* v. *Díaz Ríos*, 107 D.P.R. 140 (1978); *Pueblo* v. *Vázquez López*, 98 D.P.R. 15 (1969).

### III

Por los fundamentos expresados, *las sentencias aquí apeladas serán confirmadas*.

El Juez Asociado Señor Hernández Denton concurre en el resultado sin opinión. El Juez Presidente Señor Pons Núñez no intervino.