ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| EL PUEBLO DE PUERTO RICO<br><br>Parte Apelada<br><br>v.<br><br>PELEGRÍN BALAGUER RAMOS<br><br>Parte Apelante | KLAN202400078 | *Apelación,* procedente del Tribunal de Primera Instancia, Sala Superior de Mayagüez<br><br>Caso Núm.:<br>ISCR202300021<br><br>Sobre:<br>Art. 2.8 Ley 54 |

Panel integrado por su presidente, el Juez Rivera Colón, el Juez Monge Gómez y el Juez Cruz Hiraldo.

Monge Gómez, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 5 de septiembre de 2024.

Compareció ante este Tribunal la parte apelante, el Sr. Pelegrín Balaguer Ramos (en adelante, el "señor Balaguer Ramos" o el "Apelante"), mediante recurso de apelación presentado el 23 de enero de 2024. Nos solicitó la revocación de la *Sentencia Enmendada* emitida y notificada por el Tribunal de Primera Instancia, Sala Superior de Mayagüez (en adelante, el "TPI"), el 2 de enero de 2024. Mediante dicho dictamen, el TPI encontró culpable al Apelante por violar el Artículo 2.8 de la Ley Núm. 54 de 15 de agosto de 1989, según enmendada, conocida como "Ley para la Prevención e Intervención con la Violencia Doméstica", 8 LPRA sec. 628 (en adelante, "Ley 54").

Por los fundamentos que expondremos a continuación, se *confirma* la *Sentencia Enmendada* apelada.

**I.**

El caso de epígrafe se originó el 1 de noviembre de 2022, con la radicación de una "**Denuncia**" por parte del Ministerio Público en contra del señor Balaguer Ramos por infracción al Artículo 2.8 de la Ley 54, *supra,*

Número Identificador
SEN2024_____

que tipifica el delito de incumplimiento de órdenes de protección. 8 LPRA sec. 628. En síntesis, al Apelante se le imputó haber enviado un video a través de la plataforma *Facebook* a la Sra. Ivonne Rivera Ortiz (en adelante, la "señora Rivera Ortiz"), a sabiendas de que existía una orden de protección expedida en su contra. Ese mismo día, se determinó causa probable para su arresto por el delito previamente mencionado. Posteriormente, la vista preliminar se llevó a cabo el 19 de diciembre de 2022. Allí, el foro primario determinó que existe causa probable para acusar al Apelante. Así las cosas, el Ministerio Público presentó el correspondiente pliego acusatorio. En detalle, la acusación lee como sigue:

> El referido acusado Pelegr[í]n Balaguer Ramos, allá en o para el día 31 de octubre de 2022 y en Sabana Grande; Puerto Rico, que forma parte de la jurisdicción del Tribunal de Primera Instancia, Sala de Mayagüez, ilegal, voluntaria, y criminalmente violentó a sabiendas las prohibiciones estipuladas en la orden de protección número OPA2022-028508 expedida de conformidad con esta Ley el día 19 de octubre de 2022 con vigencia hasta el día 10 de noviembre de 2022 por el Hon. Padilla Galiano. Consistente en que el acusado le envió un video por la red social de facebook a la aquí perjudicada a sabiendas de la existencia de una orden de protección.

Luego de varios trámites procesales, el juicio en su fondo se celebró por jurado los días 25 y 31 de octubre de 2023 y 1 y 2 de noviembre de 2023. Una vez finalizado el desfile de prueba, el 20 de diciembre de 2023, el TPI emitió una *Sentencia* a través de la cual condenó al señor Balaguer Ramos a una pena de ocho (8) años bajo el régimen de libertad a prueba y le impuso el pago de la pena especial de $300.00. Dicho dictamen fue enmendado el 2 de enero de 2024, a los fines de corregir la omisión de la palabra "años".

Inconforme con lo anteriormente resuelto, el Apelante acudió a este Tribunal mediante el recurso de epígrafe, en el que señaló los siguientes errores:

1. Cometió error el TPI al declarar culpable al apelante sin que la culpabilidad del mismo fuera probada más allá de duda razonable como lo requiere la Constitución de Estados Unidos y la de Puerto Rico.
2. Cometió error el TPI al declarar culpable al apelante del delito imputado sin que el Ministerio Público probara más allá de duda razonable la cadena de custodia del teléfono celular de la querellante y en el

cual alegadamente se había recibido el mensaje que daba origen a la acusación presentada.

3. Cometió error el TPI al declarar culpable al apelante del delito imputado sin que el Ministerio Público probara más allá de duda razonable que la orden de protección ex parte que daba origen al pliego acusatorio hubiese sido diligenciada cumpliendo con un debido proceso de ley en la persona del apelante.

4. Cometió error el TPI al declarar culpable al apelante del delito imputado sin que el Ministerio Público probara más allá de duda razonable que perteneciera al apelante la cuenta de Facebook de "Pele Bala" y de donde alegadamente se envió el mensaje que declaró la parte perjudicada que recibió.

5. Cometió error el TPI al declarar culpable al apelante del delito imputado sin que el Ministerio Público probara más allá de duda razonable que el perfil "Pele Bala" fuera creado utilizado por el apelante, así como que éste enviara una comunicación a la querellante. (resolver por este)

6. Cometió error el TPI al permitir que durante el informe al Jurado el Ministerio Público expusiera a éste manifestaciones impertinentes, inflamatorias y desprovistas de base en la evidencia desfilada.

7. Que de ser posible que alguno de los errores antes aludidos, por sí solos, no fueran perjudiciales o suficientes para requerir la revocación de la sentencia condenatoria, lo cierto es que estos apreciados en conjunto y por su efecto acumulativo, resulta claro que el apelante no tuvo un juicio justo e imparcial como lo requiere la Constitución de Estados Unidos y la de Puerto Rico.

El 4 de septiembre de 2024, compareció la Oficina del Procurador General, en representación del Estado, mediante "**Alegato de El Pueblo**".

Con el beneficio de la comparecencia de ambas partes, procedemos a resolver.

**II.**

**A.**

Es norma sólidamente establecida en nuestra jurisdicción que no se favorece la intervención de los tribunales apelativos al momento de revisar la apreciación de la prueba, la adjudicación de credibilidad o las determinaciones de hechos formulados por el Tribunal de Primera Instancia en ausencia de pasión, prejuicio, parcialidad o error manifiesto. Pueblo v. Negrón Ramírez, 213 DPR ___ (2024), 2024 TSPR 41; Pueblo v. Hernández Doble, 210 DPR 850, 864 (2022). Por tal razón, se les concede

gran deferencia a las determinaciones de hechos realizadas por los juzgadores de instancia, así como a las adjudicaciones de credibilidad que estos hacen sobre los testigos que declaran ante ellos. Pueblo v. Negrón Ramírez, *supra*, pág. 18. Esto responde al hecho de que son el Juez y el Jurado los que están en mejor posición para aquilatar la prueba testifical al tener la oportunidad de oír, ver y apreciar el comportamiento de los testigos. Íd., pág. 16; Pueblo v. Hernández Doble, *supra*, pág. 864. Esto adquiere mayor relevancia cuando se trata de la prueba oral desfilada en el juicio. Pueblo v. Negrón Ramírez, *supra*, págs. 16-17. Además, "[e]l veredicto del Jurado, como la sentencia del [J]uez, es un acto investido con la alta dignidad de la magistratura en la función juzgadora de la conducta de los hombres, y no es para echarse a un lado con liviandad e indiferencia". Pueblo v. Figueroa Rosa, 112 DPR 154, 159 (1992).

Ahora bien, se ha reconocido que a pesar de la deferencia que merece la determinación apelada, la misma podría ser revocada si: (1) se demuestra que hubo pasión, prejuicio o parcialidad y/o si se incurre en error manifiesto o (2) si la prueba no concuerda con la realidad fáctica, es increíble o imposible. Pueblo v. Santiago et al., 176 DPR 133, 148 (2009). Es decir, los tribunales apelativos tienen la potestad de sustituir el criterio de los tribunales de instancia en aquellas ocasiones en que, "a la luz de la prueba admitida, no exista base suficiente que apoye su determinación". Pueblo v. Hernández Doble, *supra*, pág. 865.

Nuestro más alto foro ha definido pasión, perjuicio o parcialidad como "aquellas inclinaciones personales de tal intensidad que llevan a un juzgador a actuar movido por éstas y a adoptar posiciones, preferencias o rechazos con respecto a las partes o sus causas, sin admitir cuestionamientos sobre las mismas y sin importar la prueba que se haya presentado en el juicio". Pueblo v. Negrón Ramírez, *supra*, pág. 19. Por otro lado, han expresado que "las conclusiones del tribunal se considerarán claramente erróneas si un análisis de la totalidad de la evidencia recibida revela que las conclusiones están en conflicto con el balance más racional, justiciero y jurídico". Pueblo v. Hernández Doble, *supra*, pág. 865.

**B.**

En nuestro ordenamiento jurídico, la presunción de inocencia representa uno de los derechos más significativos y fundamentales para quienes enfrentan acusaciones criminales. Esta presunción se encuentra consagrada en el Artículo II, Sección 11 de la Constitución de Puerto Rico, la cual dispone que, en todos los procesos criminales, "el acusado disfrutará del derecho a gozar de la presunción de inocencia". Const. PR, Art. II, Sec. 11, 1 LPRA. En sintonía con ello, nuestras Reglas de Procedimiento Criminal establecen que en cualquier proceso criminal se considerará inocente al acusado hasta que demuestre lo contrario y si hay dudas razonables sobre su culpabilidad, será absuelto. 34 LPRA Ap. II, R. 110. Así pues, la presunción de inocencia es un componente esencial del debido proceso de ley. Pueblo v. Irizarry, 156 DPR 780, 786 (2002).

Dada la robustez de la presunción de inocencia, el acusado puede confiar en ella sin la necesidad de proporcionar pruebas para su defensa. Íd., pág. 787. Esto es, le corresponde al Estado presentar evidencia y cumplir con la carga probatoria para demostrar, más allá de duda razonable, todos los elementos del delito, la intención criminal y la vinculación de la persona acusada con los hechos. Pueblo v. Negrón Ramírez, supra, págs. 12-13; Pueblo v. Santiago et al., supra, pág. 142. Además, no solo es necesario que el Estado presente pruebas relacionadas con los elementos del delito imputado, sino que éstas deben ser suficientes y satisfactorias. Pueblo v. Negrón Ramírez, supra, pág. 13; Pueblo v. Irizarry, supra, pág. 787. Es decir, deben producir "certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido". Pueblo v. Negrón Ramírez, supra, pág. 13. Por ende, la falta de evidencia sobre alguno de los elementos del delito significaría que el Estado no ha cumplido con su carga probatoria, lo que resultaría en la absolución del acusado en relación con el delito que se le imputa. Íd.

No obstante, para rebatir esta presunción no es necesario alcanzar certeza matemática, sino que basta la certeza moral obtenida mediante un análisis racional. Pueblo v. Rosario Reyes, 138 DPR 591, 598 (1995). **En**

**otras palabras, no es necesario eliminar toda duda posible sino vencer todas las dudas basadas en el razonamiento de todos los elementos de juicio envueltos en el caso, evitando las que sean meramente especulativas o imaginarias**. Pueblo v. Negrón Ramírez, *supra*, pág. 13. **Finalmente, la duda razonable que acarrea la absolución es aquella que se produce de una consideración justa, imparcial y serena de la totalidad de la evidencia del caso**. Pueblo v. García Colón I, 182 DPR 129, 175 (2011). De manera que, la duda realmente justificada se reduce a la insatisfacción o inquietud de la conciencia del juzgador con la prueba provista. Pueblo v. Irizarry, *supra*, pág. 788.

### C.

La violencia doméstica es una problemática persistente que afecta nuestra sociedad puertorriqueña. Así, la Ley 54, *supra*, fue promulgada con el propósito de establecer una serie de medidas dirigidas a eludir y disminuir este tipo de conducta en nuestro país. Pizarro v. Nicot, 151 DPR 944, 952 (2000). Como política pública de este estatuto, el Gobierno de Puerto Rico rechaza enérgicamente la violencia doméstica por ser contraria a los valores de armonía, integridad y respeto que este pueblo quiere mantener para los individuos, las familias y la comunidad en general. 8 LPRA sec. 601.

Así pues, a través de esta ley se pretende fomentar el desarrollo y fortalecimiento de remedios eficaces para ofrecer protección y asistencia a las víctimas de violencia doméstica. Íd. Para enfrentar esta situación, se incorporaron distintas medidas de manera integrada para acelerar los procesos y obtener órdenes de protección contra los ofensores, permitiendo así, el arresto inmediato sin necesidad de obtener una orden en determinados casos. Pueblo v. Ayala García, 186 DPR 196, 207 (2012). También se ofrecen opciones de rehabilitación y educación para los agresores. Íd.

En detalle, el Artículo 2.5 de la Ley 54, *supra*, regula lo concerniente a las órdenes *ex parte*. Según el referido Artículo, el TPI puede emitir órdenes de protección de forma *ex parte* si determina lo siguiente:

(a) Se han hecho gestiones de forma diligente para notificar a la parte peticionada con copia de la citación expedida por el tribunal y de la petición que se ha radicado ante el tribunal y no se ha tenido éxito; o
 (b) existe la probabilidad de que dar notificación previa a la parte peticionada provocará el daño irreparable que se intenta prevenir al solicitar la orden de protección,
o (c) cuando la parte peticionaria demuestre que existe una probabilidad sustancial de riesgo inmediato de maltrato. 8 LPRA sec. 625.

Es menester destacar que, respecto a este tipo de órdenes de protección, el Tribunal "lo hará con carácter provisional, notificará inmediatamente, y dentro del término que no podrá exceder de cuarenta y ocho (48) horas a la parte peticionada, con copia de la misma o de cualquier otra forma, y le brindará una oportunidad para oponerse a ésta". Íd.

Por su parte, el Artículo 2.8 de la Ley 54, *supra*, dispone lo siguiente respecto a las violaciones de órdenes de restricción:

**Cualquier violación a sabiendas de una orden de protección expedida, de conformidad con esta Ley, será castigada como delito grave de tercer grado** en su mitad inferior, disponiéndose que los tribunales vendrán obligados a imponer supervisión electrónica, de concederse cualquier tipo de sentencia suspendida. No obstante, lo dispuesto por la Regla 11 de las Reglas de Procedimiento Criminal, según enmendada, aunque no mediare una orden a esos efectos, todo oficial del orden público deberá efectuar un arresto, si se le presenta una orden de protección expedida al amparo de esta Ley o de una ley similar, contra la persona a ser arrestada; o si determina que existe dicha orden mediante comunicación con las autoridades pertinentes, el patrono de la peticionaria o la compañía de seguridad que tenga a cargo el control de acceso donde reside la peticionaria y tienen motivos fundados para creer que se han violado las disposiciones del mismo. 8 LPRA sec. 628 (énfasis suplido).

En otras palabras, cuando una persona está consciente de la existencia de una orden de protección y aun así viola las condiciones impuestas en ella, incurre en el delito de incumplimiento de órdenes de protección. En dichos casos, la imposición de supervisión electrónica es imperativa. Esto es así ya que, las violaciones a las condiciones de las órdenes de protección subrayan la gravedad de desobedecer las medidas establecidas para salvaguardar el bienestar de las víctimas de maltrato o violencia.

**D.**

La Regla 136 de las de Procedimiento Criminal es la disposición dirigida a regular los informes al jurado. Esta dispone lo siguiente:

> Terminada la prueba, las partes harán sus informes comenzando con el del fiscal, quien podrá además cerrar brevemente el debate, limitándose a rectificar el informe del acusado. El tribunal podrá en el ejercicio de su sana discreción limitar la duración y el número de los informes. 34 LPRA Ap. II, R. 136.

El Tribunal Supremo de Puerto Rico ha establecido que el propósito de los informes finales es llamar la atención del jurado sobre aquellas inferencias que puedan derivarse de la evidencia testifical y documental presentada en el juicio pues, es al jurado al que le compete dirimir las controversias de hecho. Pueblo v. Fournier, 80 DPR 390, 407 (1958). Así pues, en cuanto al contenido de los informes, tanto el fiscal como la defensa pueden comentar sobre la evidencia presentada y tienen amplia libertad para elaborar conclusiones, inferencias, deducciones y argumentos que se deriven de ella, aun cuando "sean improbables, ilógicos, erróneos o absurdos". Íd., págs. 407-408; Pueblo v. Suárez Fernández,116 DPR 842, 851 (1986).

Dentro de esas normas, el fiscal –al igual que el abogado de la defensa– cuenta con una libertad considerable al formular su discurso ante el jurado. Tanto el Ministerio Público como la defensa pueden usar "imágenes oratorias, literarias o poéticas y hasta ciertas vituperaciones" ya que éstas no constituyen necesariamente conducta impropia. Pueblo v. Fournier, *supra*, pág. 408. Sin embargo, esa libertad muy amplia del argumento no puede degenerar en conducta abusiva. Íd.

Por otra parte, se ha aclarado que, durante el informe al jurado, no es lícito hacer referencia a prueba que no fue admitida en el juicio, así como urgir al jurado a que haga inferencias sin base en la prueba admitida. Íd. Asimismo, existen ciertas limitaciones en cuanto a los argumentos que sí son lícitos. Entiéndase, no se debe inflamar o excitar las pasiones o prejuicios del jurado: (1) haciendo referencia a evidencia inadmisible; (2) urgiéndole que haga inferencias sin base en la prueba admitida; (3) pidiéndole que descarte la evidencia admitida y que funde su veredicto en

consideraciones irrelevantes; (4) pidiéndole que no pese la evidencia como prescribe la ley; (5) invocando prejuicios raciales o económicos en contra del acusado; o (6) haciendo referencia al hecho de que el acusado se negó a testificar. Íd.

Ahora bien, ante la posibilidad de que el representante del Ministerio Público haya realizado manifestaciones impropias en su discurso, "**no procede una revocación a menos que se pruebe que oca[s]ionaron perjuicio a los derechos sustanciales del acusado, es decir, que el veredicto fue influenciado por esa conducta impropia**".[1] Íd., págs. 408-409 (énfasis suplido). A ese respecto, **el juez que preside el proceso cuenta con una amplia discreción**, **que sólo debe alterarse si se demuestra que abusó de la misma.** Esto debido a que es él quien "conoce la atmósfera del juicio, oye el énfasis del comentario, aprecia la susceptibilidad de los jurados y el grado de atención que le prestan a esta o a aquella parte del argumento." Íd., pág. 408.

**III.**

En el presente caso, el Apelante nos solicitó que revoquemos la *Sentencia* del TPI mediante la cual fue declarado culpable del delito de incumplimiento de orden de protección.

Como segundo y tercer señalamiento de error, el señor Balaguer Ramos plantea que el TPI erró al declararlo culpable del delito imputado sin que se probara más allá de duda razonable: (1) la cadena de custodia del teléfono celular de la querellante y que (2) la orden de protección *ex parte* hubiese sido diligenciada conforme al debido proceso de ley.

La Regla 28 de nuestro Reglamento exige que el alegato de un apelante en un caso criminal incluya una descripción breve y concisa de los errores que, según el apelante, fueron cometidos por el Tribunal de Primera Instancia. Además, dispone que se debe incluir una discusión de

---

[1] *Véase,* además, Pueblo v. Dones Arroyo, 106 DPR 303 (1977), nota al calce núm. 1. ("Informes al jurado dentro de los límites establecidos en Fournier, *supra*, no constituyen error revocable debido a que no es lógico suponer que los jurados sean personas de sensibilidad tan extrema que cualquier expresión o incidente, […] les afecte el ánimo de tal forma que les impida rendir un veredicto imparcial".)

dichos errores, acompañada de las disposiciones legales y la jurisprudencia aplicable.  4 LPRA Ap. XXII-B, RR. 28(C)(1) (d) y (e).

Lo anterior, debido a que los errores no discutidos en un recurso se entienden renunciados y no serán considerados por los tribunales revisores. Pueblo v. Miró González, 133 DPR 839, 857 (1993). Así se ha pautado jurisprudencialmente que:

> La exigencia de que el escrito de apelación contenga un señalamiento de error y una discusión del mismo no es un mero preciosismo inconsecuente. Es en la discusión del error donde se enmarca la actuación alegadamente errónea del foro primario cuya revocación se ha solicitado, a la luz de los hechos y del derecho aplicable. Es lo que se ha denominado "el corazón" de la apelación o "la artillería pesada". No podemos olvidar que el derecho, particularmente el derecho o práctica apelativa, es rogado. Morán v. Martí, 165 DPR 356, 369 (2005).

Así pues, es claro que, en materia de derecho apelativo, las partes no deben menospreciar la exigencia de que los señalamientos de error en una apelación sean discutidos de manera apropiada y con referencia a los hechos en los que basa los asuntos de derecho que solicita la intervención de los foros apelativos, pues el resultado de ello es que se entiendan por renunciados al tiempo que se limita nuestra labor revisora.

Como podemos observar, en el escrito intitulado "**Alegato del Apelante**" que presentó el señor Balaguer Ramos no se incluyó la discusión del segundo y tercer señalamiento de error. Esto significa que no nos colocó en posición para poder revisar las determinaciones del foro primario respecto a los mismos. Por esta razón, estamos impedidos de resolver los errores que presentó el Apelante, en los cuales señaló que el TPI erró al no probar la cadena de custodia del teléfono celular de la señora Rivera Ortiz y al determinar que la orden de protección fue diligenciada correctamente, toda vez que, se entiende que dichos planteamientos fueron renunciados al no incluir una discusión concisa sobre la prueba presentada y los planteamientos de derecho aplicables. Simplemente, la presunta discusión de los aludidos errores se efectuó, de manera conjunta, con los planteamientos de derecho relacionados a que el Ministerio Público no probó la culpabilidad del Apelante más allá de toda duda razonable.

Resuelto lo anterior, procedamos a discutir los demás señalamientos de error. Los señalamientos de error cuatro (4) y cinco (5) están estrechamente relacionados, por lo que se abordarán de manera conjunta en la discusión. En detalle, el señor Balaguer Ramos alega que el TPI erró al declararlo culpable del delito imputado, sin que el Ministerio Público probara que la cuenta de *Facebook* de "Pele Bala" le perteneciera, fuera creada o utilizada por él, así como que éste enviara una comunicación a la señora Rivera Ortiz que provocó su acusación. No nos convence su postura. Veamos.

Del expediente ante nuestra consideración se desprende que el 19 de octubre de 2022, la señora Rivera Ortiz solicitó una "**Orden de Protección Ex Parte**" en contra del Apelante mediante la cual se le prohibió a este último lo siguiente:

> Ordena a la parte peticionada abstenerse de visitar y/o acercarse a:
> El hogar de la parte peticionaria y sus alrededores
> El hogar de los familiares de la parte peticionaria y sus alrededores.
> El lugar de trabajo o el negocio de la parte peticionaria y sus alrededores.
> El vehículo de motor que utiliza la parte peticionaria.
> Ordena a la parte peticionada abstenerse de realizar llamadas telefónicas y de enviar mensajes de texto o de voz a los números telefónicos personales de trabajo, de familiares y de amigos (as) de la peticionaria.
> Ordena a la parte peticionada abstenerse de enviar correos electrónicos, cartas o facsímiles a la parte peticionaria.
> **Ordena a la parte peticionada a abstenerse de tener contacto o interferir con la peticionaria por cualquier red social tales como: Facebook,** Twitter, MySpace, entre otras.[2] (Énfasis suplido).

La vigencia de dicha orden de protección se extendía desde el 19 de octubre de 2022 hasta el 10 de noviembre del mismo año.[3] Estando vigente la misma, el señor Balaguer Ramos contactó a la señora Rivera Ortiz a través de la aplicación *Messenger* de *Facebook*, a pesar de la prohibición explícita que impedía tal comunicación. En específico, envió un "reel" que mostraba dos (2) fósforos encendidos con el siguiente mensaje:

---

[2] *Véase*, Orden de Protección *Ex Parte*, pág. 1.
[3] *Véase*, Orden de Protección *Ex Parte*, pág. 1.

"es más corto el camino si somos dos, es más fácil fundirse si hay calor, es mejor perdonarse que decir lo siento".[4]

Conforme hemos adelantado, los tribunales apelativos no debemos intervenir con la apreciación de la prueba, la adjudicación de credibilidad o las determinaciones de hechos del foro primario a no ser que hayan incurrido en pasión, perjuicio, parcialidad o error manifiesto al desempeñar sus funciones. Pueblo v. Negrón Ramírez, 213 DPR ___ (2024). Así pues, debemos concederles gran deferencia a las determinaciones de hechos realizadas por los juzgadores de instancia, así como a las adjudicaciones de credibilidad que estos hacen sobre los testigos que declaran ante ellos. Id. pág. 18. Esto se debe a que el Juez y el Jurado están en la mejor posición para aquilatar la prueba testifical, dado que tienen la oportunidad de oír, ver y apreciar el comportamiento de los testigos. Pueblo v. Hernández Doble, *supra*, pág. 864.

Tras examinar minuciosamente la documentación del expediente del caso, incluida la transcripción de la prueba oral presentada (TPO), hemos determinado que el Ministerio Público logró demostrar que el perfil de *Facebook* denominado "Pele Bala" le pertenece al Apelante y que el video enviado a través de dicho perfil fue enviado por él. Esto se fundamenta en el testimonio, bajo juramento, de la señora Rivera Ortiz, el cual fue considerado creíble por el juzgador de los hechos. Esta declaró que el perfil en cuestión pertenecía al Apelante, quien lo creó mientras estaba con ella con el propósito exclusivo de mantener comunicación entre ambos.[5] Asimismo, la señora Rivera Ortiz afirmó que el Apelante, mediante dicho perfil, le hizo una solicitud para que convivieran.[6] En específico, la señora Rivera Ortiz testificó lo siguiente:

> Fiscal Vélez: Yo le pregunto señora Rivera Ortiz, ¿qué ocurrió si algo con Pelegrín Balaguer el 31 de octubre del 2022 que usted quiera declarar en la mañana de hoy?
> Sra. Rivera: El 31 del 2022 a las 6:22 de la mañana recibí un mensaje por la aplicación Messenger de Facebook lo cual no lo abrí a esa hora sólo escuche el tono que, o sea sonó el teléfono. En ese momento estaba vistiéndome,

---

[4] *Véase*, Transcripción de la prueba oral de la vista del 31 de octubre de 2023, pág. 14.
[5] *Véase*, Transcripción de la prueba oral de la vista del 1 de noviembre de 2023, pág. 6 y 7.
[6] *Véase*, Transcripción de la prueba oral de la vista del 1 de noviembre de 2023, pág. 73.

preparándome para trabajar. Llegué al trabajo, di mi primera clase, luego de mi primera clase abrí el mensaje y me percaté que era un mensaje de él.

**Fiscal Vélez: ¿Cómo usted se percata que el mensaje es de él, cuando usted dice es de él a qué usted se refiere, a quién?**

**Sra. Rivera: El mensaje es del señor Pelegrín Balaguer. Ese es…**

**Fiscal Vélez: ¿Cómo usted se percata?**

**Sra. Rivera: Ese es su perfil de Facebook.**

**Fiscal Vélez: ¿Cómo usted sabe que es su perfil?**

**Sra. Rivera: Porque ese perfil él lo abrió para hablar conmigo.**

Fiscal Vélez: ¿Hace cuánto tiempo si lo sabe, si lo recuerda?

Sra. Rivera: Exactamente no recuerdo, fecha exacta no recuerdo, **pero lo abrió estando conmigo**.[7] (Énfasis suplido).

[…]

Fiscal Vélez: ¿Y por cuál cuenta entonces ustedes se comunicaban…

Sra. Rivera: Por…

Fiscal Vélez: …el último periodo de tiempo?

**Sra. Rivera: Por la de Pelebala**.[8] (Énfasis suplido).

[...]

Fiscal Vélez: Su relación a la manifestación que usted hace de que tuvo varias comunicaciones con el acusado antes de, meses atrás a ese perfil, ¿a qué usted se refería con eso?

**Sra. Rivera: Yo recuerdo que él me envió un mensaje por allí y pidiéndome este como vivir conmigo algo así y yo, eso es lo más que yo recuerdo**.

Fiscal Vélez: ¿A qué perfil usted hace referencia entonces?

Sra. Rivera: A…

Fiscal Vélez: ¿Cómo se llama ese perfil?

Sra. Rivera: **Pelebala**.[9] (Énfasis suplido).

Luego de evaluar el testimonio bajo juramento de la señora Rivera Ortiz, el jurado concluyó que el perfil identificado con el nombre "Pele Bala" le pertenecía al Apelante y que este le envió un mensaje a la señora Rivera Ortiz el 31 de octubre de 2022, mientras estaba vigente una orden de protección en su contra. Es decir, después de descartar cualquier incertidumbre que pudiera ser meramente especulativa o basada en suposiciones infundadas, el jurado determinó con certeza que el mensaje fue enviado por el Apelante. Además, es menester resaltar que no surge del expediente prueba tendente a establecer lo contrario o alguna evidencia que hubiera desembocado en un resultado distinto en la apreciación del

---

[7] Véase, Transcripción de la prueba oral de la vista del 1 de noviembre de 2023, pág. 5, 6 y 7.

[8] *Véase*, Transcripción de la prueba oral de la vista del 1 de noviembre de 2023, pág. 34.

[9] *Véase*, Transcripción de la prueba oral de la vista del 1 de noviembre de 2023, pág. 73.

juzgador de los hechos. Es decir, al analizarla no hallamos razones en derecho que nos obliguen a sustituir nuestro criterio por el del jurado. En suma, en el expediente existe prueba que establece que la cuenta "Pele Bala" fue creada por el Apelante; que la víctima y este último se comunicaban por vía de dicha cuenta de *Facebook*; y que el señor Balaguer Ramos le remitió, desde dicha cuenta, el mensaje a través de la aplicación de *Messenger*.

Por otro lado, la ausencia de evidencia por parte del Ministerio Publico sobre el correo electrónico vinculado al perfil de "Pele Bala" resulta irrelevante. Esto se debe a que el correo electrónico no es el único medio para establecer la identidad de una persona asociada a un perfil de *Facebook*. En efecto, la autenticidad y la titularidad del perfil pueden ser confirmadas mediante el testimonio de alguien que tenga conocimiento directo del mismo, tal como ocurrió en el presente caso. Así, el testimonio de la señora Rivera Ortiz fue suficiente para establecer la conexión entre el perfil de *Facebook* desde donde se remitió el mensaje y el Apelante, sin requerir la información sobre el correo electrónico asociado a dicha cuenta. Esto, pues en nuestro ordenamiento jurídico un hecho puede ser probado mediante el testimonio de una persona que le consten los mismos de propio y personal conocimiento. Así, para entender que un hecho está probado mediante prueba oral, la persona testigo tiene que declarar sobre aquella materia de la cual tenga conocimiento personal. En palabras similares, basta con la evidencia directa a través de un testimonio que le merezca credibilidad al juzgador para probar cualquier hecho.

Por su parte, es pertinente aclarar que el hecho de que la señora Rivera Ortiz haya cambiado de número de teléfono celular es inconsecuente, ya que el mensaje fue recibido a través de la aplicación de *Messenger*; quiérase decir que indistintamente del número o equipo que se haya utilizado, lo verdaderamente importante es que se ostente una cuenta en dicha aplicación y se descargue esta última en el aparato móvil. Por consiguiente, para comprobar que recibió el aludido mensaje no era necesario cotejar su número de teléfono, puesto que lo que debía

verificarse era que ella recibió en su bandeja de entrada un mensaje del Apelante. Dicha circunstancia pudo ser comprobada a través de su testimonio.

Por lo tanto, huérfano el expediente apelativo de evidencia específica tendente a establecer que el TPI actuó con pasión, perjuicio, parcialidad o error manifiesto a la hora de adjudicarle credibilidad al testimonio bajo juramento de la señora Rivera Ortiz, no estamos en condiciones de intervenir con la apreciación de la prueba presentada. Por tales razones, no erró el TPI al determinar que el perfil "Pele Bala" le pertenecía al Apelante y que el video fue enviado por él.

Aclarado lo anterior, pasemos a la discusión del sexto señalamiento de error. El Apelante sostiene que el TPI erró al permitir que, durante el informe al jurado, el Ministerio Público expusiera manifestaciones impertinentes, inflamatorias y desprovistas de base en la evidencia desfilada.

Del expediente ante nuestra consideración surge que la Fiscal Vélez realizó las siguientes expresiones durante el informe al jurado:

> [N]o sé si se percataron, pero el día de ayer se cumple un año de los hechos ocurridos. Un año que la señora Ivonne Rivera Ortiz ha tenido que pasar por este proceso múltiples vistas, muchísimo tiempo porque **el acusado aquí presente violó la Orden de Protección, no respetó la orden de un Tribunal. Contrario a ustedes que gracias a Dios que respetaron las órdenes del Tribunal y llegaron temprano todos los días.**[10] (Énfasis suplido).
>
> […]
>
> Damas y caballeros del Jurado si algo hemos aprendido aquí es que las órdenes del Tribunal se respetan. Ustedes respetaron la orden del Tribunal y aquí quedó claro bajo sus propias contestaciones a preguntas de esta Fiscal todo acto tiene su consecuencia. Hablamos de que tiene que existir una ley y un orden porque si no hay consecuencia por violar la ley entonces que nos espera. **Que tenemos que esperar que haya un incidente de violencia física, eso es lo que tenemos que esperar.** Ah no eso es un video nada más, un video de amor nada más. Eso sigue siendo una violación a Orden de Protección porque por algo están esas prohibiciones allí, por algo se les explica a la persona.[11] (énfasis suplido).
>
> […]

---

[10] *Véase*, Transcripción de la prueba oral de la vista del 1 de noviembre de 2023, pág. 89-134.

[11] *Véase*, Transcripción de la prueba oral de la vista del 1 de noviembre de 2023, pág. 107.

Fiscal Vélez: ¿Qué tenemos que esperar? Que maten una persona como lo vemos todos los días en los noticieros.

Fiscal Vélez: Disculpen. ¿Qué tenemos que esperar? No podemos esperar y ustedes son las Juezas y Jueces en esto. Está en sus manos poder llevar el mensaje de que las leyes y las órdenes que emite el Tribunal se respetan y deben ser, si es válida porque no se va a cumplir. Y no podemos comenzar a entonces determinar que es un, que bendito vamos a dejarle pasar esto. ¿Qué tenemos que esperar entonces? Que esto escale. Porque la señora Ivonne actuó, actúo rápido, no esperó a que esto escalara. Violó la Orden de protección y ella hizo lo que tenía que hacer.[12]

Conforme hemos adelantado, los informes finales tienen como objetivo orientar al jurado sobre las inferencias que se pueden extraer de la evidencia presentada durante el juicio. Pueblo v. Fournier, *supra*, pág. 407. Por consiguiente, tanto el fiscal como la defensa tienen la libertad de comentar sobre la evidencia y de desarrollar conclusiones, inferencias y argumentos basados en ella, incluso si estos son improbables, ilógicos o erróneos. Pueblo v. Suarez Fernández, *supra*, pág. 851. Así pues, estos pueden utilizar imágenes oratorias, literarias o poéticas ya que estas no se consideran necesariamente como conducta indebida. Pueblo v. Fournier, *supra*, pág. 408. **Sin embargo, esta amplia libertad en los argumentos no debe transformarse en conducta abusiva**. Íd. Es decir, no se debe incitar o alimentar las pasiones o prejuicios del jurado mediante: (1) referencia a evidencia inadmisible, (2) la exhortación a hacer inferencias sin base en la prueba admitida, (3) la solicitud de que ignore la evidencia presentada, (4) la petición de que no pese la evidencia como prescribe la ley, (5) la invocación de prejuicios raciales o económicos, (6) la mención de que el acusado se negó a testificar. Íd.

Luego de analizar cuidadosamente las declaraciones realizadas por la fiscal Vélez, hemos determinado que sus comentarios no fueron impertinentes, inflamatorios ni carecieron de fundamento en la evidencia presentada. En otras palabras, las intervenciones de la fiscal se ajustaron a la prueba admitida en el juicio, sin incurrir en tácticas que pudieran provocar emociones indebidas en el jurado o basarse en información

---

[12] *Véase*, Transcripción de la prueba oral de la vista del 1 de noviembre de 2023, pág. 109-111.

irrelevante. Nótese que la representante del Ministerio Público estaba dentro de su derecho de utilizar imágenes oratorias y poéticas en su discurso, así como de enfatizar la importancia del cumplimiento de las órdenes del Tribunal. Esta libertad permite que el fiscal señale la gravedad de la situación y exhorte al jurado a considerar la seriedad de las violaciones alegadas. Así pues, la referencia a que el señor Balaguer Ramos no respetó la orden de protección y la pregunta retórica sobre esperar a que ocurra un daño irremediable pueden ser vistas como una forma de acentuar la necesidad de justicia, lo que está permitido en el marco de su argumentación. En otras palabras, las manifestaciones de la fiscal Vélez se mantuvieron dentro de los parámetros que previenen la conducta abusiva y no excedieron las restricciones aplicables a los argumentos permitidos durante el informe al jurado. Por tales razones, no se cometió el error señalado.

El primer y último señalamiento de error están íntimamente relacionados, por lo que se abordarán de manera conjunta. El Apelante sostiene que el TPI erró al declararlo culpable del delito de violación de orden de protección, sin que su culpabilidad fuera probada más allá de duda razonable. Además, alega que en caso de que alguno de los errores por sí solo no fuera suficiente para requerir la revocación de la *Sentencia Enmendada*, su efecto acumulativo provocó que su juicio no fuera justo ni imparcial. No le asiste la razón. Nos explicamos.

Para facilitar la comprensión de nuestro análisis, procedemos a resumir la prueba testifical que tuvo ante sí el foro sentenciador.

**Agente Wenceslao Padilla Laboy**

El agente Wenceslao Padilla Laboy (en adelante, "Agt. Padilla Laboy") es agente investigador de la Policía de Puerto Rico y trabaja en la División de Crímenes Cibernéticos de Mayagüez.[13] Testificó que el 30 de noviembre de 2022, el Agt. Bermúdez llegó con una dama para realizar una extracción a su dispositivo Samsung S20.[14] Expresó que le entregó a la

---

[13] *Véase*, Transcripción de la prueba oral de la vista del 25 de octubre de 2023, pág. 38.
[14] *Véase*, Transcripción de la prueba oral de la vista del 25 de octubre de 2023, pág. 42.

mujer un documento de consentimiento de registro para poder manipular dicho dispositivo.[15] Indicó que entró al área de configuración del teléfono para extraer la información que le solicita el Negociado de la Policía para completar el informe y certificación de evidencia digital.[16] Testificó que accedió a la aplicación de *Messenger* y mediante "screen recording" extrajo la información.[17] Después conectó el teléfono celular a una computadora para hacer la extracción y guardar la información a un *pendrive* en presencia de ambos.[18]

Expresó que al obtener la información, le indicó a la dama que podía marcharse ya que esta había corroborado que toda la información estaba correcta.[19] Luego pasó la información a otra computadora para proveerle un número de evidencia y quemarlo en un *DVD*.[20] Sostuvo que el proveedor que le brinda el servicio a dicho teléfono celular es Claro.[21] Indicó que el informe contiene una certificación de que la información descubierta es original.[22] Señaló que el informe fue realizado el 30 de noviembre de 2022 y que la Agt. Denise Méndez firmó como testigo de dicha extracción.[23]

De igual manera, el Agt. Padilla Laboy testificó que ninguna persona además de él tuvo acceso o control al sistema donde se encuentra la información extraída del celular.[24] Expresó que tuvo la oportunidad de observar el *DVD* una vez se llevó a cabo la extracción y no identificó alteración alguna.[25] Aclaró que el teléfono celular pertenecía a la perjudicada del caso.[26] Expresó que el video fue obtenido del perfil que lleva el nombre "Pele Bala".[27] Respecto al contenido del video testificó lo siguiente:

> Agte. Padilla: Sí. Me lleva a ese formato que tiene, dice indica Diani Carrillo, la cual hay dos eh como palillo de fósforos

---

[15] *Véase*, <u>Transcripción de la prueba oral de la vista del 25 de octubre de 2023</u>, pág. 42.
[16] *Véase*, <u>Transcripción de la prueba oral de la vista del 25 de octubre de 2023</u>, pág. 48.
[17] *Véase*, <u>Transcripción de la prueba oral de la vista del 25 de octubre de 2023</u>, pág. 55.
[18] *Véase*, <u>Transcripción de la prueba oral de la vista del 25 de octubre de 2023</u>, pág. 62.
[19] *Véase*, <u>Transcripción de la prueba oral de la vista del 25 de octubre de 2023</u>, pág. 62.
[20] *Véase*, <u>Transcripción de la prueba oral de la vista del 25 de octubre de 2023</u>, pág. 56.
[21] *Véase*, <u>Transcripción de la prueba oral de la vista del 25 de octubre de 2023</u>, pág. 57.
[22] *Véase*, <u>Transcripción de la prueba oral de la vista del 25 de octubre de 2023</u>, pág. 58.
[23] *Véase*, <u>Transcripción de la prueba oral de la vista del 25 de octubre de 2023</u>, págs. 58 y 60.
[24] *Véase*, <u>Transcripción de la prueba oral de la vista del 25 de octubre de 2023</u>, pág. 67.
[25] *Véase*, <u>Transcripción de la prueba oral de la vista del 25 de octubre de 2023</u>, pág. 74.
[26] *Véase*, <u>Transcripción de la prueba oral de la vista del 31 de octubre de 2023</u>, pág. 13.
[27] *Véase*, <u>Transcripción de la prueba oral de la vista del 31 de octubre de 2023</u>, pág. 13.

> verdad, uno encendido y ese el único, el mensaje que pues está brindando ese video.
>
> Fiscal Vélez: ¿Cuántos segundos usted dijo aproximado que…
>
> Agte. Padilla: Aproximadamente veinte…
>
> Fiscal Vélez:…de cual el video específicamente?
>
> Agte. Padilla: 21 segundos aproximadamente. "Es más corto el camino si somos dos, es más fácil fundirse si hay calor, es mejor perdonarse que decir lo siento".[28]

Por último, a preguntas del abogado de defensa, el Agt. Padilla Laboy afirmó que no se solicitó una citación o "subpoena" de la compañía telefónica Claro ni se investigó el Messenger del señor Pele Bala.[29]

**Agente Carlos Feliciano Rodríguez**

El Agente Carlos Feliciano Rodríguez (en adelante, "Agt. Feliciano Rodríguez") es un agente investigador del Negociado de la Policía de Puerto Rico perteneciente al Distrito de Maricao.[30] Testificó que el 20 de octubre de 2022 se encontraba en el turno de 12:00 p.m. a 8:00 p.m.[31] Indicó que ese día, el Sargento Maximino Valentín le dio una orden de protección para que la diligenciara.[32] Siguiendo esta directriz, aproximadamente a la 1:10 p.m., llegó a la Escuela Superior de Maricao junto al sargento y otro compañero para diligenciarle la orden de protección al señor Balaguer Ramos, quien es maestro de dicha institución.[33] Respecto al proceso del diligenciamiento de la referida orden de protección, indicó lo siguiente:

> Agte. Feliciano: Sí me personé allí con el sargento y otro compañero que se encontraba conmigo y hablamos con la directora de la escuela relacionado al asunto y pues ella nos indicó que lo iban a llamar y que lo esperáramos en la parte de afuera de los portones afuera de la escuela ya que como no era nada que tenía que ver con la escuela pues que lo esperáramos afuera en los portones de los predios afuera de la escuela.
>
> Fiscal Vélez: Y le pregunto usted, ¿una vez usted espera en los predios de la escuela qué ocurre luego si algo?
>
> Agte. Feliciano: Pues llegó este el señor Pelegrín Balaguer y pues le indico de la orden, le indico que había una orden este de parte de la peticionaria Ivonne Rivera en contra de él, entonces se le explica de la orden y se le dice que, que…

---

[28] *Véase*, Transcripción de la prueba oral de la vista del 31 de octubre de 2023, pág. 14.

[29] *Véase*, Transcripción de la prueba oral de la vista del 31 de octubre de 2023, pág 18 y 23.

[30] *Véase*, Transcripción de la prueba oral de la vista del 31 de octubre de 2023, pág. 34.

[31] *Véase*, Transcripción de la prueba oral de la vista del 31 de octubre de 2023, pág. 36.

[32] *Véase*, Transcripción de la prueba oral de la vista del 31 de octubre de 2023, pág. 36.

[33] *Véase*, Transcripción de la prueba oral de la vista del 31 de octubre de 2023, pág. 36 y 61.

Fiscal Vélez: ¿Cuándo usted dice que se le explica, explique, valga la redundancia, a las damas y caballeros del Jurado qué quiere decir se le explica?

Agte. Feliciano: Que ella saca una orden en contra de, de Orden de Protección la cual el Tribunal este indica que debe de abstenerse a unos puntos que el Juez indica en a orden y se le enseña dónde están para que entonces luego que se le entrega una copia…

Fiscal Vélez: ¿Unos puntos, qué son esos puntos agente?

Agte. Feliciano: Pues unos puntos que indican que él n puede, sabe que él tiene que abstenerse a acercar, como quien dice acercarse a ella, hacer llamadas telefónicas y varios puntos que indican en la orden.

Fiscal Vélez: Le pregunto, agente, ¿qué nombre, por qué nombre se le llama a la parte perjudicada la solicitante de la Orden de Protección?

Agte. Feliciano: No entiendo, no entendí.

Fiscal Vélez: ¿Cuál es la parte Pelegrín Balaguer Ramos usted declaró que usted fue a diligenciar verdad la orden de Protección que hay en su contra?

Agte. Feliciano: Sí.

Fiscal Vélez: ¿Quién la solicita?

Agte. Feliciano: La peticionaria Ivonne Rivera Ortiz.[34]

[…]

Fiscal Vélez: ¿Le pregunto agente como parte… ¿qué proceso si alguno usted llevó a cabo como parte de su diligenciamiento, de ese diligenciamiento que usted hizo?

Ate. Feliciano: Se le entrega una copia de la orden.

Fiscal Vélez: ¿A quién?

Agte. Feliciano: A Pelegrín y entonces indicándole pues que me firme el orden este que es la que va para el Tribunal. Que me la firme, entonces él me la firmó y le, él me indicó si le podía poner la fecha y la hora y pues se le dejó poner la fecha y la hora y el, y su firma encima del nombre del.

Fiscal Vélez: ¿Además de colocar su firma qué otro proceso si alguno usted llevó a cabo como parte de sus funciones como diligenciante de la orden?

Agte. Feliciano: Pues se le entrega una copia a él de la orden para que pueda este leerla completa y…[35]

Asimismo, el Agt. Feliciano Rodríguez aclaró que la orden de protección fue registrada en Sabana Grande y estuvo vigente desde el 19 de octubre de 2022 hasta el 10 de noviembre de 2022. [36]

**Agente Enrique Figueroa Albino**

El agente Enrique Figueroa Albino (en adelante, "Agt. Figueroa Albino") es agente investigador de la Policía de Puerto Rico adscrito al Distrito de Sabana Grande.[37] Testificó que conoce a la señora Rivera Ortiz

---

[34] *Véase*, Transcripción de la prueba oral de la vista del 31 de octubre de 2023, págs. 38-39 y 44.

[35] *Véase*, Transcripción de la prueba oral de la vista del 31 de octubre de 2023, págs. 44-45.

[36] *Véase*, Transcripción de la prueba oral de la vista del 31 de octubre de 2023, págs. 51 y 52.

[37] *Véase*, Transcripción de la prueba oral de la vista del 31 de octubre de 2023, pág. 79.

porque el 31 de octubre de 2022 llamó al Cuartel del Distrito de Sabana Grande indicando que tenía una Orden de Protección de Ley 54, *supra*, contra el señor Balaguer Ramos.[38] Declaró que basado en la información obtenida de esa llamada, le ordenaron pasar a la Escuela Gaztambide.[39]

Respecto a la investigación, manifestó lo siguiente:

> Agte. Figueroa: Vamos con el supervisor, esta el patrullero y la compañera Martiza Ayala, a la escuela Gazambide, Calle 25 de julio en Sabana Grande a entrevistar a la querellante, la señora Ivonne Rivera Ortiz.
> Fiscal Vélez: Le pregunto agente, ¿Dónde se llevó a cabo esa entrevista de la que usted habla?
> Agte. Figueroa: En la oficina de la Escuela Gaztambide de la cual ella llamo.
> Fiscal Vélez: ¿Quiénes se encontraban allí agente?
> Agte. Figueroa: Se encontraba ella y la trabajadora social de dicha escuela.
> Fiscal Vélez: Y le pregunto, ¿Qué surge de la entrevista que usted le hizo a la parte perjudicada la señora Ivonne?
> Agte. Figueroa: Por eso es que estamos aquí, me identifico con mi nombre el agente Enrique Figueroa Albino adscrito al Distrito de Sabana Grande eh, en que podríamos ayudarle, que se recurrió a su llamada al Cuartel Distrito de Sabana Grande. Ella me corroboró que estaba, tenía una Orden de protección ex parte de su ex pareja que había solicitado en el Tribunal de San Germán el día 19 de octubre, la cual llevo después al cuartel de Sabana Grande, la misma fue diligenciada posteriormente a la escuela urbana de Maricao, el día 20, el cual ya su ex pareja tenía conocimiento. Posterior a eso, ese mismo día 31 después de esos días ella recibió un mensaje de texto en horas de la mañana a eso de las 6:22 de la mañana. Un mensaje de texto por la aplicación Messenger, la cual yo le dije, ¿Qué que decía? Entonces ella explicó que era de nombre eh Pele Bala y yo dije ¿Quién es Pele Bala? Pues comunicación que había tenido anteriormente con su ex pareja antes de esta conversación de Messenger el cual, o sea tenía conversaciones anteriormente con él antes de esta conversación de Messenger el cual, o sea tenía conversaciones anteriormente con él antes de poner esa orden, por eso ella identifico que era su ex pareja.
> Fiscal Vélez: Y le pregunto agente, ¿usted menciona ese nombre y ese nombre la dama le indica, la parte perjudicada, que corresponde ese nombre específicamente a la cuenta?
> Agte. Figueroa: La cuenta de Messenger, el cual tenía anteriormente con su ex pareja que tenía diálogos antes por la aplicación del Messenger de haber sacado esta Orden de protección.
> Fiscal Vélez: ¿Cuándo usted dice que ella le indica que tenía anteriormente comunicación con su pareja de quien estamos hablando, a quien ella hace referencia cuando dice su ex pareja?
> Agte. Figueroa: Su ex pareja, menciona el nombre de Pelegrín Balaguer Ramos. Eso nos indica ella.
> Fiscal Vélez: Le pregunto, ¿Cómo parte de su entrevista que ocurrió luego si algo que ella le hace estas manifestaciones a usted?

---

[38] *Véase*, Transcripción de la prueba oral de la vista del 31 de octubre de 2023, pág. 81.
[39] *Véase*, Transcripción de la prueba oral de la vista del 31 de octubre de 2023, pág. 84.

Agte. Figueroa: Me enseno por su aplicación de su a eso de las 6:22 de la mañana un mensaje de texto a las 6:22 del 31, el cual indicaba como unos muñecos como de fósforo quemándose y yo le dije que implicaba eso…[40]

[…]

El Agt. Figueroa Albino testificó que luego de que la señora Rivera Ortiz le mostrara el video, procedió a consultar con la fiscal de turno y corroboró en el Cuartel la existencia de la Orden de Protección.[41] Luego llamó al Cuartel de Maricao y le explicó lo que había sucedido. [42] Expresó que, en Maricao, cierto agente arrestó al señor Balaguer Ramos y lo condujo al cuartel de Sabana Grande.[43] Indicó que llevaron al Apelante a un cuarto investigativo donde se le hicieron las advertencias correspondientes. Este último le expresó que conocía la razón por la cual estaba ahí, pero que no tenía comunicación con la señora Rivera Ortiz desde que firmó la orden de protección y que su celular estaba descompuesto.[44]

**Agente Roger Bermúdez**

El agente Roger Bermúdez (en adelante, "Agt. Roger Bermúdez") es agente investigador de la Policía de Puerto Rico adscrito a la División de Violencia Doméstica del área de Mayagüez.[45] Testificó que el 31 de octubre de 2022 recibió una Querella relacionada al señor Balaguer Ramos y se dirigió al Distrito de Sabana Grande a investigar dicha querella.[46] Expresó que entrevistó tanto a la señora Rivera Ortiz como al Apelante.[47] Indicó que la señora Rivera Ortiz le manifestó que ella había solicitado una Orden de Protección y que el señor Balaguer Ramos, a sabiendas de que tenía una orden de protección, le envió un mensaje de amor a través de su teléfono, en el cual aparece el nombre de "Pele Bala".[48] Por último, declaró que tuvo

---

[40] *Véase*, Transcripción de la prueba oral de la vista del 31 de octubre de 2023, págs. 85-89.
[41] *Véase*, Transcripción de la prueba oral de la vista del 31 de octubre de 2023, págs. 89-90.
[42] *Véase*, Transcripción de la prueba oral de la vista del 31 de octubre de 2023, pág. 91.
[43] *Véase*, Transcripción de la prueba oral de la vista del 31 de octubre de 2023, pág. 91.
[44] *Véase*, Transcripción de la prueba oral de la vista del 31 de octubre de 2023, pág. 92.
[45] *Véase,* Transcripción de la prueba oral de la vista del 31 de octubre de 2023, pág. 146.
[46] *Véase*, Transcripción de la prueba oral de la vista del 31 de octubre de 2023, pág. 148.
[47] *Véase*, Transcripción de la prueba oral de la vista del 31 de octubre de 2023, pág. 149
[48] *Véase*, Transcripción de la prueba oral de la vista del 31 de octubre de 2023, pág. 149.

la oportunidad de examinar la orden de protección y el video donde hay dos figuras en llamas donde una está halando al otro hacia el fuego.[49]

**Sra. Ivonne Rivera Ortiz**

La señora Rivera Ortiz testificó que es maestra de profesión en la Escuela José R. Gaztambide.[50] Expresó que el Apelante fue su pareja desde el 2019.[51] Respecto a los hechos del presente caso declaró lo siguiente:

> Sra. Rivera: El 31 de octubre del 2022 a las 6:22 de la mañana recibí un mensaje es por la aplicación Messenger de Facebook lo cual no lo abrí a esa hora solo escuche el tono que, o sea sonó el teléfono. En ese momento estaba este vistiéndome, preparándome para trabajar. Llegue al trabajo, di mi primera clase, luego de mi primera clase abrí el mensaje y me percate que era un mensaje de él.
> Fiscal Vélez: ¿Cómo usted se percata que el mensaje es de él, cuando usted dice es de el a que usted se refiere a quién?
> Sra. Rivera: El mensaje es del señor Pelegrín Balaguer. Ese es…
> Fiscal Vélez: ¿Cómo usted se percata?
> Sra. Rivera: Ese es su perfil de Facebook.
> Fiscal Vélez: ¿Cómo usted sabe que es su perfil?
> Sra. Rivera: Porque ese perfil él lo abrió para hablar conmigo.
> Fiscal Vélez: ¿Hace cuánto tiempo si lo sabe, si lo recuerda?
> Sra. Rivera: Exactamente no recuerdo, fecha exacta no recuerdo, pero lo abrió estando conmigo.[52]

[…]

> Fiscal Vélez: ¿Cuánto tiempo después si lo recuerda un aproximado, pasó, transcurrió entre la conversación que había tenido anteriormente por ese perfil y ese mensaje que le llega al perfil, a su Messenger el 31 de octubre?
> Sra. Rivera: Meses.
> Fiscal Vélez: ¿Meses?
> Sra. Rivera Sí meses.
> Fiscal Vélez: ¿Y cuándo usted entonces abre ese mensaje de Messenger con qué se encuentra?
> Sra. Rivera: Era, era un video donde había dos fósforos este representando personas quemándose donde uno arrastraba otro al fuego.
> Fiscal Vélez: ¿Recuerda la duración de ese video?
> Sra. Rivera: No lo recuerdo.
> Fiscal Vélez: ¿Cuánto dura?
> Sra. Rivera: No lo recuerdo.
> Fiscal Vélez: Le pregunto, ¿cómo se llamaba ese perfil desde donde usted recibe ese mensaje?
> Sra. Rivera: Pelebala.[53]

[…]

---

[49] *Véase*, Transcripción de la prueba oral de la vista del 31 de octubre de 2023, págs. 150-151.
[50] *Véase*, Transcripción de la prueba oral de la vista del 1 de noviembre de 2023, págs. 4 y 5.
[51] *Véase*, Transcripción de la prueba oral de la vista del 1 de noviembre de 2023, pág. 5.
[52] *Véase*, Transcripción de la prueba oral de la vista del 1 de noviembre 2023, págs. 6 y 7.
[53] Véase, Transcripción de la prueba oral de la vista del 1 de noviembre de 2023, págs. 8 y 9.

Fiscal Vélez: Sí, ¿Ivonne qué usted hizo, qué acción llevó a cabo si alguna?
Sra. Rivera: Okey. Rápidamente llamé a la policía.
Fiscal Vélez: ¿Por qué usted llamó a la policía?
Sra. Rivera: porque yo solicité una Orden de Protección en contra del señor Balaguer.
Fiscal Vélez: ¿Cuándo usted solicitó esa Orden de Protección?
Sra. Rivera: El 19 de octubre del 2022.
Fiscal Vélez: ¿Dónde usted solicitó esa Orden de protección?
Sra. Rivera: El 19 de octubre del 2022.
Fiscal Vélez: ¿Dónde usted solicitó esa Orden de Protección?
Sra. Rivera: En el Tribunal de San Germán.
Fiscal Vélez: ¿Cuándo entra en vigencia la Orden de Protección desde qué fecha?
Sra. Rivera: En el mismo momento.
Fiscal Vélez: ¿Hasta que fecha si lo recuerda?
Sra. Rivera: 10 de noviembre de 2022.[54]

La Sra. Rivera Ortiz testificó que llamó al cuartel de Sabana Grande y le comunicó al agente que había recibido un mensaje del señor Balaguer Ramos por la aplicación de *Messenger* y que ella tenía una orden de protección expedida en contra de él.[55] Expresó que este le indicó que fuera a un lugar seguro de la Escuela por lo que se dirigió a la Oficina de la trabajadora social.[56] Luego llegaron tres (3) agentes de la Policía y le pidieron que fuera al Cuartel.[57] Así pues, se dirigió al Cuartel de Sabana Grande. [58]Allí, fue entrevistada por el Agt. Figueroa y llenó una planilla con el Agt. Bermúdez.[59] Por último, declaró que visitó la División de Crímenes Cibernéticos aproximadamente un mes después de los hechos porque su labor como maestra le impidió acudir rápidamente.[60]

Resumida la prueba testifical que tuvo ante sí el juzgador de los hechos, pasemos a evaluarla a la luz del derecho aplicable.

Es norma constitucional conocida en nuestra jurisdicción que un acusado en un procedimiento criminal goza de una presunción de inocencia. Const. PR, Art. II, Sec. 11, 1 LPRA. Asimismo, nuestras Reglas de Procedimiento Criminal establecen que los acusados se presumirán

---

[54] *Véase*, Transcripción de la prueba oral de la vista del 1 de noviembre de 2023, págs. 9-10
[55] *Véase*, Transcripción de la prueba oral de la vista del 1 de noviembre de 2023, pág. 13.
[56] *Véase*, Transcripción de la prueba oral de la vista del 1 de noviembre de 2023, pág. 14.
[57] *Véase*, Transcripción de la prueba oral de la vista del 1 de noviembre de 2023, pág. 14.
[58] *Véase*, Transcripción de la prueba oral de la vista del 1 de noviembre de 2023, pág. 15.
[59] *Véase*, Transcripción de la prueba oral de la vista del 1 de noviembre de 2023, págs. 15 y 22.
[60] *Véase*, Transcripción de la prueba oral de la vista del 1 de noviembre de 2023, pág. 27.

inocentes, mientras no se pruebe lo contrario, y en caso de existir duda razonable acerca de su culpabilidad, se le absolverá. 34 LPRA Ap. II, R. 110. Así pues, es responsabilidad del Ministerio Público presentar evidencia y cumplir con el peso probatorio para demostrar, sin dejar lugar a dudas razonables, todos los elementos del delito, la intención criminal y la conexión de la persona acusada con los hechos. Pueblo v. Santiago *et al.*, *supra*, pág. 142.

Relacionado con lo anterior, la Ley 54, *supra*, establece una serie de medidas dirigidas a evitar y disminuir la violencia doméstica en Puerto Rico. Así, su Artículo 2.5 permite que las víctimas de violencia doméstica soliciten órdenes de protección *ex parte* en contra de sus agresores. 8 LPRA sec. 625. El Tribunal puede emitir este tipo de orden siempre y cuando: (1) se hayan hecho gestiones de forma diligente para notificar a la peticionada y no se haya tenido éxito, (2) exista probabilidad de que ocurra un daño irreparable si se notifica previamente a la parte peticionada, o (3) la parte peticionaria demuestre que existe una probabilidad sustancial de riesgo inmediato de maltrato. Íd. Cualquier persona que viola una orden de protección expedida incurre en un delito grave de tercer grado. 8 LPRA sec. 628. Esto es, para establecer los elementos del delito de incumplimiento de orden de protección, según fuera imputado al Apelante, se hacía necesario que se demostrara la existencia de una orden de protección, que la misma le fue notificada al Apelante y que el señor Balaguer Ramos violentó la orden de protección mediante el empleo de conducta específicamente detallada en la misma, con pleno conocimiento de que la violación a dicha orden era una consecuencia prácticamente segura de su conducta. *Véase*, 33 LPRA sec. 5035 (2) (a); 8 LPRA sec. 628.

Luego de evaluar el expediente ante nuestra consideración, con especial atención a la TPO de los testimonios vertidos en el juicio, estamos convencidos de que la prueba presentada por el Ministerio Público estableció, más allá de toda duda razonable, todos los elementos del delito imputado al Apelante, así como su intención criminal y su conexión con los hechos. Nótese, pues, que se estableció que el 19 de octubre de 2022, la

señora Rivera Ortiz solicitó una orden de protección *ex parte* contra el señor Balaguer en el Municipio de Sabana Grande, cuya vigencia era del 19 de octubre del 2022 hasta el 10 de noviembre del mismo año. De igual forma, la prueba demostró que, al día siguiente, el Agt. Feliciano Rodríguez se personó en la Escuela Superior de Maricao para diligenciarle la orden al señor Balaguer Ramos.[61]  Allí, le explicó al Apelante que existía una orden de protección en su contra por parte de la señora Rivera Ortiz, le explicó que debe abstenerse de ciertos puntos, le mostró en qué parte de la orden se indicaba la conducta proscrita y le entregó una copia de la misma.[62]

La evidencia también reveló que doce (12) días después de la expedición de la referida orden, específicamente, el 31 de octubre de 2022, el Apelante le envió un video a la señora Rivera Ortiz por la plataforma *Messenger* a través de su perfil de *Facebook* "Pele Bala" con el mensaje: "Es más corto el camino si somos dos, es más fácil fundirse si hay calor, es mejor perdonarse que decir lo siento".[63] Esto es, aunque la orden de restricción indicaba claramente que debía evitar cualquier tipo de comunicación con la señora Rivera Ortiz, el Apelante lo hizo de todas formas. Específicamente, la orden de protección en controversia establecía lo siguiente: "[Se] **[o]rdena a la parte peticionada a abstenerse de tener contacto o interferir con la peticionaria por cualquier red social tales como: Facebook,** Twitter, MySpace, entre otras.[64] (Énfasis suplido).

En fin, no hemos hallado indicador alguno que nos obligue a no concederle gran deferencia a las determinaciones de hechos realizadas por el juzgador de instancia, así como a las adjudicaciones de credibilidad que éste efectuó sobre los testigos que declararon ante sí. Pueblo v. Negrón Ramírez, *supra*, pág. 18. Fue el distinguido juzgador de hechos que tuvo la oportunidad de oír, ver y apreciar el comportamiento de los testigos. Íd., pág. 16. Tampoco surge del análisis de la prueba que hubiera mediado pasión, prejuicio o parcialidad o algún error manifiesto llevado a cabo por

---

[61] *Véase*, Transcripción de la prueba oral de la vista del 31 de octubre de 2023, págs. 36 y 61.

[62] *Véase*, Transcripción de la prueba oral de la vista del 31 de octubre de 2023, págs. 38 y 39.

[63] *Véase*, Transcripción de la prueba oral de la vista del 31 de octubre de 2023, págs. 14.

[64] *Véase*, Orden de Protección *Ex Parte*, pág. 1.

el TPI. La prueba fue específica a los efectos de que la orden de protección prohibía cualquier comunicación de parte del Apelante con la víctima, incluyendo por vía de la red social *Facebook*. Asimismo, no existe duda de que la misma estaba vigente al momento en que ocurrieron los hechos. Además, se demostró que la cuenta "Pele Bala" le pertenecía al señor Balaguer Ramos y que este último conocía de la expedición de la orden de protección en controversia. Siendo ello así, es palmario que el Apelante violó a sabiendas la orden de protección y, en unión a toda la prueba que aquilató el jurado, el Ministerio Público pudo establecer la configuración de todos los elementos del delito imputado al señor Balaguer Ramos. Nótese, pues, que a la luz de todo lo expuesto en la presente *Sentencia*, no podemos validar la teoría del Apelante, a los efectos de que existió una acumulación de errores en el proceso que le privaron de un proceso justo y no perjudicial.

Al examinar la evidencia, notamos que la misma concuerda con la realidad fáctica de lo ocurrido el día de los hechos. Es decir, entendemos que, a la luz de la prueba admitida, no existe base suficiente que apoye la contención del señor Balaguer Ramos en su recurso, a los efectos de que el Ministerio Público no logró establecer su culpabilidad más allá de toda duda razonable y que no tuvo un juicio justo e imparcial. Más aún cuando el acto de aquilatar y apreciar la prueba está investido con "la alta dignidad de la magistratura en la función juzgadora de la conducta de los hombres, y no es para echarse a un lado con liviandad e indiferencia". Pueblo v. Figueroa Rosa, *supra*, pág. 159 (1992). Así pues, al adoptar esta determinación, no tenemos inquietud ni insatisfacción en nuestra conciencia respecto a la prueba presentada.

**IV**.

Por los fundamentos que anteceden, los cuales hacemos formar parte integral del presente dictamen, *confirmamos* la *Sentencia Enmendada* apelada.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones